**LAUREL SAND & GRAVEL, INC. and Maryland Midland Railway, Inc.**

v.

**CSX TRANSPORTATION, INC.**

Civ. No. PN–87–1582.

United States District Court, D. Maryland.

Jan. 26, 1989.

Robert G. Levy, Leonard E. Cohen, Berryl A. Speert, Harry J. Katrichis, A. David Demiray and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., Fritz R. Kahn, Washington, D.C., for plaintiffs.

Charles M. Chadwick, Chadwick & Whaley, Rockville, Md., for plaintiff Maryland Midland Ry., Inc.

Richard McMillan, Jr., Kent A. Gardiner and Crowell & Moring, Washington, D.C., Rachel E. Geiersbach, Baltimore, Md., for defendant.

## OPINION AND ORDER

NIEMEYER, District Judge.

This antitrust case raises the issues whether the refusal by the defendant railroad company to give the plaintiffs the right to use its tracks (trackage rights) was pursuant to and in furtherance of a conspiracy to restrain trade in violation of § 1 of the Sherman Act; and whether the same refusal was an abuse of a monopoly power that the railroad company is alleged to have in a market defined by the plaintiffs to be the rail transportation of aggregate materials to the Baltimore–Washington area in violation of § 2. An issue of standing to sue has also been raised.

Laurel Sand & Gravel, Inc., a manufacturer and distributor of aggregates such as crushed stone, and Maryland Midland Railway, Inc. (MMR), a shortline railroad company having 67 miles of track, have sued CSX Transportation, Inc., a national railroad company having 20,000 miles of track. In Count I of the two count complaint, plaintiffs allege that CSX conspired with Millville Quarry, Inc., a competitor of Laurel Sand & Gravel, to exclude Laurel Sand & Gravel from the aggregates market in the Baltimore–Washington corridor in violation of § 1 of the Sherman Act. In Count II MMR (the only plaintiff in Count II) alleges that CSX, in violation of § 2 of the Sherman Act, monopolized a market defined as "rail transportation of aggregate materials to the Baltimore–Washington corridor" by refusing to grant MMR access to an essential facility, i.e., tracks controlled by CSX.

Following the filing of a motion for summary judgment by CSX, the parties submitted exhaustive, well-written, and well-documented briefs that included the core materials of evidence that would be presented at trial. They also filed a complete pretrial order, accompanied by pretrial memoranda, that has been entered in the case. On January 12, 1989, the Court heard oral argument for an entire day and thereafter studied additional submissions of the parties.

The Court has concluded that the historical facts are not substantially in dispute, at least as to those that are considered material, and that a trial will not advance resolution of the disputes raised by this case. Rather, the resolution of this case will turn on an analysis of the antitrust implications

of the historical facts, which are questions of law under the standards set forth by the Supreme Court in *Matsushita Electric Industrial Company Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although there are showings by the plaintiff of agreements between CSX and Millville Quarry, Inc. that well could be found at trial to be illegal restraints of trade, the denial of trackage rights, which forms the sole basis of plaintiffs' claims in this case, has not been shown to be pursuant to or in furtherance of an illegal conspiracy. The denial of trackage rights also does not form the basis of an illegal monopolization under § 2 of the Sherman Act.

For the reasons that are given hereafter, the Court will enter summary judgment in favor of CSX on both counts of the complaint.

## I.

### FACTS

*Transactions between plaintiffs and CSX.*

Laurel Sand & Gravel, Inc. was incorporated in 1982 and thereafter acquired a site for the production and distribution of sand and gravel located mid-way between Baltimore and Washington, adjacent to a junction of railroad lines known as Annapolis Junction. The main rail line running through Annapolis Junction, generally in a north-south direction, is owned by CSX. With the imminent depletion of reserves and increasing demand in the Baltimore–Washington area for aggregates such as sand, gravel and crushed stone, Laurel Sand & Gravel planned to acquire a stone quarry within the general area and ship crushed stone by rail into its Annapolis Junction site for distribution. During its planning, Laurel Sand & Gravel had concluded that when transporting aggregates more than 35 miles, rail transportation would provide greater efficiencies than truck transportation and therefore reduce its transportation costs. It contends that in 1982 it made known to CSX its plan to acquire a quarry and requested rail access into the site. Access to the site would involve the acquisition or construction of a spur track off of the main CSX line into the site.

After it acquired the Annapolis Junction property in 1982, Laurel Sand & Gravel undertook to locate a quarry. In 1986, some four years later, it purchased Barrick Quarry near Frederick, Maryland, which was located on the line of MMR. The MMR track ran essentially east and west and connected with CSX's main line at a point northwest of Baltimore known as Emory Grove in Glyndon, Maryland. To transport stone, therefore, from the Barrick quarry into the Annapolis Junction distribution facility, Laurel Sand & Gravel would have to make arrangements with both MMR and CSX under a "joint line" agreement. See the map that follows.

Following discussions between Laurel Sand & Gravel and MMR, during which MMR proposed a joint line rate of $3.38 per ton for transporting stone from the Barrick Quarry into Annapolis Junction, MMR contacted CSX in July of 1986 to enlist its participation. MMR proposed to CSX that MMR charge Laurel Sand & Gravel $1.55 per ton for the trip from Barrick Quarry to Emory Grove, and that CSX transport the stone from Emory Grove into Annapolis Junction at a rate of $1.83 per ton, for a total of $3.38 per ton. CSX reviewed the proposal and its cost, as well as the impact that the proposal would have on its relationship with Millville Quarry, Inc., an existing customer and a competitor of Laurel Sand & Gravel. In November 1986, after numerous meetings and inquiries from Laurel Sand & Gravel, CSX proposed a rate of $2.95 per ton for its portion of the trip.

When MMR and Laurel Sand & Gravel received this quotation, they determined that the price was too high and considered it an "exit" offer—an offer not made to be accepted. They thereupon made a request in a letter dated November 7, 1986, that CSX provide "trackage rights," i.e., that CSX rent MMR the use of its tracks, without CSX providing any transportation service. Plaintiffs anticipated that this would cost them about $.25 per ton. CSX refused the request and stated that it preferred "to work with [plaintiffs] through revenue adjustment [on transportation service] rather than through a trackage right arrangement." An internal memorandum that provided input into this decision at CSX contained the recommendation of the director of shortline sales as follows:

It is my personal view that this matter is essentially a marketing decision, recognizing that the significant operating

problems presented by this request would require considerable effort to resolve. From a sales standpoint, however, I am opposed to this proposal because of the precedent it may set.... Carried to an extreme, CSX could be reduced to a toll collector.

The parties thereafter pursued negotiations during which the proposed rate for transportation service from Emory Grove to Annapolis Junction was reduced. At the threat and threshold of litigation, CSX decided to offer what it considered a break even proposition, "one cent over the variable cost as it computed it," of $2.12 per ton. At the hearing in court CSX conceded that the final offer was not a profitable rate for CSX but was made in an attempt to avoid suit. It was transmitted to the plaintiffs shortly after this suit was filed.

It became apparent, however, from the record and the discussions with counsel for Laurel Sand & Gravel at the hearing, that even if the $2.12 offer had been made earlier, it would not have allowed Laurel Sand & Gravel to be competitive. Laurel Sand & Gravel still would have to pay MMR $1.55 for the leg of the trip that ran from Frederick to Glyndon, for a total of $3.67 per ton, which was significantly more than was being paid by Millville Quarry, Inc. for transportation of its crushed stone to Annapolis Junction. Since the offer from CSX of $2.12 per ton could not be accepted by plaintiffs, that transaction is not the subject of the claim in suit. Rather, plaintiffs have sued solely because CSX refused to rent to MMR the tracks for use by MMR.

*Transactions between Millville and CSX.*

Sometime before 1982 (before Laurel Sand & Gravel acquired its Annapolis Junction site) Millville Quarry, Inc. and affiliated companies, all of whom are referred to by counsel and the Court as Millville, expressed to CSX an interest in establishing a stone distribution center at Annapolis Junction, and in early 1982 it leased a portion of a spur line that ran off of the main line at Annapolis Junction. It also owned property there adjacent to the CSX tracks.

Millville established a distribution center at Annapolis Junction, and sometime in 1984 CSX leased to Millville the remainder of the spur line at Annapolis Junction. As it turned out, this effectively blocked any potential access *from that line* into Laurel Sand & Gravel's distribution center. The lease agreement also permitted Millville to exclude other users from using the spur line, a provision that plaintiffs suggest is unusual in the railroad industry.

In 1985, following years of planning, Millville and CSX entered into the first of two unit-train transportation contracts for the transporting of aggregates to Annapolis Junction from Millville's quarry in Millville, West Virginia, near Charles Town. A unit-train contract is one that dedicates the use of an entire train to the transportation of a customer's product. In 1987 they entered into a second and similar contract for transportation of aggregates from Millville's quarry in Hanover, Pennsylvania.

Traditionally transportation of aggregates in the Baltimore–Washington area has been by truck and barge, and most competitors still use these forms of transportation. CSX began promoting its "rock runner," unit-train service to obtain some of the business of transporting aggregates by railroad in this market and by its estimate, it has obtained something less than five percent of the market. Its principal entree into the market was obtained through the negotiation of these two unit-train rail transportation contracts with Millville, beginning in 1985.

These contracts provide for transportation from Millville's quarry near Charles Town, West Virginia, into distribution points in Bladensburg, Maryland, (on the northeast side of Washington, D.C.) and Annapolis Junction; and from Hanover, Pennsylvania, into distribution points in Baltimore and Annapolis Junction. See the map set forth above. The rate agreed to by Millville and CSX for the transportation of aggregates from the West Virginia quarry to Annapolis Junction range between $2.60 and $3.07 per ton, depending on the tonnage. With scheduled rebates the plaintiffs have computed the effective

rate to be somewhere between $2.50 and $2.60 per ton. The Hanover quarry contract provides for rates between $2.80 to $3.00 per ton, depending on volume. Because both of Millville's quarries and its distribution center were on the CSX rail lines, both contracts involved transportation over CSX lines exclusively.

CSX valued its relationship with Millville and, as reflected in its documents, pursued a policy to protect this business. One of its internal memoranda spoke of a strategy to "treat competition fair but not at the expense of [Millville] so as to lose goodwill and bargaining integrity." The record shows that Millville was well aware of CSX's desire to protect the business established with it and it used its valuable relationship to advantage. CSX promised Millville a "most favored nations" clause agreeing, that if CSX were to allow any other competitor a rail rate less than that allowed to Millville, Millville could terminate its rail transportation contracts with CSX. CSX also assisted Millville in obtaining distribution points along the track by selling to Millville sites in Baltimore known as the Fulton Station facility and the Westport tract.

*Alleged conspiracy.*

The plaintiffs contend that CSX entered into agreements with Millville that resulted in the denial of competitive rail service to Laurel Sand & Gravel and others in the Baltimore–Washington market for aggregate materials. They contend that in furtherance of the agreements, CSX denied MMR trackage rights to the Baltimore–Washington market.

The actual conspiracy that is alleged to have been formed between CSX and Millville was allegedly entered into by Mr. Donald Sanchez of CSX and Mr. Larry A. Campbell of Millville sometime before July 1982. It is alleged that these two agreed to exclude Laurel Sand & Gravel from the aggregate market as a competitor of Millville. They argue that the agreement can be inferred from five incidents that occurred over the years.

First, they point to the 1984 lease agreement between CSX and Millville which blocked Laurel Sand & Gravel's rail access to its production and distribution facility at Annapolis Junction, which they contend is one of the few rail-served sites suitable for the distribution of aggregates in the Baltimore–Washington corridor.

Second, they allege that in early 1985 CSX increased rail rates which it had previously offered to Rockville Crushed Stone, Inc., a company that competed with Millville and Laurel Sand & Gravel. Rockville Crushed Stone intended (if it could secure appropriate zoning from Montgomery County to open a quarry) to transport aggregates by rail from a quarry known as Boyd's in Montgomery County to Rockville, Bladensburg, and a facility near Annapolis Junction on the CSX mainline. The plaintiffs allege that CSX raised the rates offered to Rockville Crushed Stone to protect Millville from the potential competition.

Third, they allege that CSX eliminated potential competition from Baltimore Asphalt & Paving Company (BAPCO) and Martin Marietta Aggregates, Inc. by conveying the Fulton Station distribution facility to Millville instead of to BAPCO, who wanted the site. They argue that Millville only sought that location when it learned of BAPCO's interest in purchasing it for the purpose of distributing crushed stone in the Baltimore market. CSX conveyed the Fulton Station facility to Millville even though Millville had another rail served distribution facility nearby in Westport which was also located in Baltimore. After the acquisition, the Fulton Station facility was never used by Millville.

Fourth, they allege CSX protected Millville by offering Laurel Sand & Gravel a noncompetitive rate for transportation of aggregate materials from Emory Grove to Annapolis Junction as part of the joint-line agreement with MMR. This was the initial $2.95 per ton quotation that was discussed above.

Finally, they allege that in 1983 CSX retained ten feet of track near Westminster as a "spite strip" which was deliberately designed to prevent the State of Maryland and MMR from securing a through-rail route from MMR's lines to Emory Grove in

Glyndon, Maryland. They also contend that CSX denied MMR access to over 17 miles of track between Highfield, near Frederick, and Hagerstown.

Each of these transactions may be potentially consistent with the anti-competitive agreement alleged. On the other hand, CSX has tendered a rational business explanation for each of the transactions.

With respect to the 1984 lease to Millville of the land and track rights at Annapolis Junction, CSX points out that although in the early 1980's Millville had shipped some stone by means of regular train service to its Bladensburg location, high volume, unit-train movement of crushed stone was an untested concept in Maryland. Millville felt that careful planning with several distribution sites would be needed to make the concept work and to justify substituting that service for the more flexible truck-type service. With respect to the allegation that the lease blocked Laurel Sand & Gravel from the main track, CSX points out that that is simply not true. The maps seem to confirm that even though the portion of track that was conveyed to Millville blocks access *at a particular point,* other points of Laurel Sand & Gravel's property are contiguous to the CSX tracks from which a spur track could be built. CSX notes further that the lease with Millville occurred at a time when Millville was actively developing its distribution center, and Laurel Sand & Gravel did not even own a stone quarry. Finally, CSX had been told that Laurel Sand & Gravel had a long-range plan to develop its Annapolis Junction site into an industrial park whereas Millville was prepared to make a long term commitment to ship a substantial volume of crushed stone by rail from that location. CSX observed that "understandably it elected to sell the property to the 'bird in hand' in order to facilitate the movement of a major new quantity of stone on CSX rail lines."

With respect to the Rockville Crushed Stone price change, CSX observes that the increases in rates that it was quoting to Rockville Crushed Stone were normal increases and that through negotiations CSX actually had to back off of certain increases that were proposed. CSX points out that its method of negotiation was vindicated because CSX and Rockville Crushed Stone actually did execute a rail transportation contract providing for rail deliveries from the Boyd's quarry.

With respect to the Fulton Station site, CSX points out that it put the property up for bid after several parties expressed an interest in it. Millville offered both a higher price for the property and offered to move more stone through the property.

Finally, in connection with the "spite strip" to control MMR access to CSX's line, CSX points out that when it sold track to MMR, it retained a ten foot section of track in order to be a participant in any negotiations to re-establish connection between the MMR line and the CSX line. A portion of the line had been washed out by Hurricane Agnes. It points out that in fact it did not impede any connection but rather promoted it, not only by providing the connection but also by selling to MMR an additional four miles of track to make the connection more efficient at Emory Grove. With respect to the alleged refusal to give access to the Hagerstown line, CSX points out that it has never refused to interchange traffic with MMR and that virtually all of MMR's revenue is derived from traffic delivered to and from CSX at that point.

Plaintiffs cited the five transactions that are described above simply as evidence of an underlying conspiracy, of which they argue denial of trackage rights was a part. Plaintiffs do not claim damages for any of these transactions. If damages had been claimed for these transactions, it is not at all clear that plaintiffs' claims would survive CSX's motion for summary judgment because CSX's explanations for these transactions might show that its conduct was "as consistent with permissible conduct as with [an] illegal conspiracy" and thus would not support an inference of an illegal conspiracy. *Matsushita, supra,* 475 U.S. at 588, 106 S.Ct. at 1357. Because plaintiffs only claim damages for the denial of trackage rights, the question for resolution is whether that decision was pursuant

to and in furtherance of the conspiracy alleged.

## II.

## SECTION 1 CLAIM

The antitrust laws represent a strong public policy designed to protect the competitive process. Any analysis of an alleged violation, for that reason, must take into account the economic realities of the market or markets involved to determine whether a plaintiff is simply complaining about losing a competitive battle or whether he has been the victim of an anti-competitive restraint. Only the latter inquiry is suspect under the antitrust laws. *See, e.g., Brunswick Corp. v. Pueblo Bowl–O–Mat Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

Two markets are purportedly involved in this litigation. Laurel Sand & Gravel and Millville compete in the sale of aggregates in the Baltimore–Washington area. This market is conceded by the plaintiffs to be a competitive one, having perhaps 20 or more participants. Plaintiffs claim, however, that by reason of the conspiracy between CSX and Millville, the additional competition to be provided by Laurel Sand & Gravel has been eliminated or lessened. They also allege in connection with the § 2 claim that competition in the market for the transportation by rail of aggregates to the Baltimore–Washington corridor has been lessened by CSX's denial of trackage rights to MMR pursuant to and in furtherance of the conspiracy with Millville.

Before conducting the appropriate analysis under the applicable caselaw, the critical facts relevant to the conspiracy should be reviewed.

Millville, the purportedly favored customer of CSX, was paying effectively $2.50 to $2.60 per ton to deliver crushed stone to Annapolis Junction. Its quarries are located on the CSX lines, so that no other form or provider of transportation had to be considered by it.

Laurel Sand & Gravel's quarry is located where crushed stone must be transported over the lines of both MMR and CSX to reach Annapolis Junction. MMR's best price to Laurel Sand & Gravel for the trip from Frederick, Maryland, to Emory Grove in Glyndon is $1.55 per ton. Therefore, Laurel Sand & Gravel could only afford to pay $1.00 to transport the crushed stone from Emory Grove to Annapolis Junction if it wanted to keep its transportation cost competitive with Millville's. A rate of $1.00 per ton for CSX is less than one-half of what CSX computes its actual cost to be, and well under what plaintiffs' own economist computes the cost to be. He set CSX's cost at $1.72 per ton. Even if CSX's cost were as low as that computed by plaintiffs' economist and CSX were to provide transportation service at cost, the total cost to Laurel Sand & Gravel for transportation from Barrick Quarry to Annapolis Junction would be $3.27 per ton, well in excess of the rate available to its competitor Millville because of its geographical advantage.

Plaintiffs realized that they could not afford even CSX's best price for its service. Therefore, when CSX initially proposed $2.95 per ton, they were quick to seize the moment and clarify the offer as an "exit" offer, too expensive to accept and tantamount to a rejection. The next day in a short letter they demanded that CSX rent its track to MMR and let MMR provide the service to Laurel Sand & Gravel.

When CSX refused, observing that it preferred to remain in the business of providing rail transportation service and not begin the business of renting track, plaintiffs focused their lawsuit on this refusal alone. Although subsequent negotiations produced a $2.12 per ton rate (which CSX claims is $.01 over its variable cost), from plaintiffs' point of view, these negotiations were only an exercise of form.

Plaintiffs have now structured their lawsuit narrowly so as to be based solely on the refusal of trackage rights, a service CSX has not offered and is not in business to offer. It does not engage in the business of renting track and granting trackage rights to feeder shortline railroads for service to sites on CSX's line. Indeed, there is no evidence that it has ever done so. The only contention to the contrary is

an assertion by counsel for the plaintiffs that CSX entered into a *reciprocal* trackage rights agreement with a shortline railroad in the Buffalo area, the business circumstances of which are not of record. It follows, therefore, that the refusal to grant trackage rights would rationally flow from CSX's normal business and would be motivated from its expressed wish not to change course. Moreover, there would appear to be no economic basis to compel such an offer. To do so would be tantamount to transferring profitable business of CSX to its feeder shortline railroads, and systematically dismantling its business.

■ More importantly, however, there is no evidence, as is required to establish a violation of § 1 of the Sherman Act in this case, that the refusal of trackage rights was in furtherance of the conspiracy that plaintiffs infer from earlier conduct of CSX. There is no factual or rational reason to believe that agreements to favor Millville as a competitor in the aggregates market motivated CSX's refusal to rent track, a step which would surrender its tools in trade from which it derives its profit.

No doubt if plaintiffs were claiming that unnecessarily high prices for CSX's service were anti-competitive and amounted to a refusal of service, which CSX had given to Millville at a lower price, the issue whether such a refusal was connected with the conspiracy alleged would be a triable one. As pointed out, however, that is not, and cannot be, the claim of plaintiffs. They are not interested in CSX's service; they want access to its tools.

■ Plaintiffs press their argument on the superficially attractive contention that CSX has engaged in a *series* of exclusionary acts in concert with Millville to deny rail access to Laurel Sand & Gravel and others, and that the refusal of trackage rights is but one in that series. While each other act cited by plaintiffs may have been suggestive of that conspiracy, the denial of trackage rights was not in furtherance of the alleged conspiracy.

As noted, the "exit" offer of $2.95 well could have been to favor Millville and in furtherance of the alleged conspiracy. But the shift in position by plaintiffs from a request for *service* to a request for *track access* was a creative attempt by plaintiffs to circumvent the inevitable unworkability of receiving *service* at any price. The request was an attempt to reduce the players involved from three (Laurel Sand & Gravel, MMR, and CSX) to two (Laurel Sand & Gravel and MMR), with the attendant savings to plaintiffs and consequential losses to CSX. Thus, the response by CSX was not in response to any pre-existing agreement to protect Millville, but rather a response unilaterally made to protect its own business. Nowhere in the record is it shown that there was any indication that CSX considered Millville's position on trackage rights, and Millville was not aware of either the request or the refusal. Logically, if the preexisting conspiracy is assumed, CSX would concern itself with Millville's position on setting a rate for service, *e.g.*, at $2.95 per ton. When it came, however, to giving up its track, the issue was no longer Millville or competition in the transportation of aggregates; the issue became the decision of CSX whether to change its long standing method of doing business. All the evidence points to the conclusion that *this* decision was unilaterally made.

When the issue was first raised in November, 1986, whether CSX would rent track to MMR, as opposed to participating with it as a feeder railroad, which is the original reason CSX sold track to MMR, the considerations necessarily focused on what product CSX would offer and whether it should alter, for the first time, its long standing way of doing business. The overwhelming presence of these business considerations makes unilateral action the only plausible alternative.

■ Section 1 of the Sherman Act prohibits every contract, combination or conspiracy in restraint of trade, which is unreasonable, that is, whose anti-competitive tendencies outweigh legitimate regulation or even pro-competitive effects. The anti-competitive tendency must adversely affect competition in the marketplace and not

merely hurt the competitors therein. For if the contract adversely impacts competitors, but is neutral or even promotes competition, the resulting damage is not of the kind that is scrutinized under the antitrust laws. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

■ A violation of § 1 requires that two or more persons act in concert. Independent action is not proscribed, and a business has a right to deal, or refuse to deal, with whomever it likes. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *U.S. v. Colgate & Company*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

■ When an agreement to restrain trade is *inferred* from other conduct, and the conduct under scrutiny is ambiguous so that by one interpretation it is consistent with the illegal agreement and by another it is consistent with independent conduct or a legitimate business purpose, proof or evidence that tends to exclude the legal course must be presented. *See Monsanto, ibid.; Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 611–12 (4th Cir.1985). In *Monsanto*, the Supreme Court concluded that complaints made to a distributor about pricing conduct of the complainant's competitor, coupled with termination of that competitor, were not sufficient, standing alone, to prove a conspiracy in violation of § 1. There must be some evidence in addition that shows a common scheme to achieve the unlawful objective. As the Court in *Monsanto* stated:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Id.* 465 U.S. at 768, 104 S.Ct. at 1473.

When a defendant puts that standard to the test on a motion for summary judgment, then the plaintiff must come forward with the evidence that tends to exclude the possibility of independent conduct. In *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court stated:

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752 [104 S.Ct. 1464, 79 L.Ed.2d 775] (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. Id. at 764, [104 S.Ct. at 1470]. *See* also *Cities Service*, [391 U.S. 253] at 280 [88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1968)]. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S. at 764, 104 S.Ct. at 1471.

*Id.* at 587–88, 106 S.Ct. at 1357.

In *Matsushita*, the plaintiff offered evidence that the defendants entered into illegal conspiracies which took place in Japan, not as violations of American law, but rather as circumstantial evidence that similar conduct took place among the defendants in the United States. While the Court of Appeals had observed that a reasonable fact finder could infer that an illegal conspiracy took place in the United States, the Supreme Court ruled that the Court of Appeals erred in failing to consider whether it was "plausible" for the defendants to participate in the illegal conspiracy in the United States. As the Supreme Court noted:

> [i]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

*Id.* at 596–97, 106 S.Ct. at 1361.

The structure of proof in the instant case is strikingly similar to that presented in *Matsushita*.

■ In this case there is concededly a total absence of direct evidence suggesting concerted action between CSX and Millville in the denial of trackage rights. Plaintiffs' argument by necessity rests on evidence of earlier incidents from which plaintiffs wish this Court to infer an overarching conspiracy. However, this evidence fails to exclude the possibility that CSX's decision to deny trackage rights was a unilateral decision motivated by plausible business reasons. An explanation of CSX's decision to deny MMR trackage rights does not require the assumption of an agreement with Millville. CSX's decision was consistent with its marketing plan. Its relationships with shortlines are created to put to use CSX's rolling stock and overhead which have been established for promoting transportation *service*. The shortlines are intended to be feeder railroads by which the demand for transportation services is fed to CSX. If CSX were to surrender this business to the feeder lines and simply rent track, it would be reduced to a "toll collector," a function which is inconsistent with its business purpose. Not only do the economic realities of the circumstances make it irrational to believe that CSX would alter its business direction in this manner, it is undisputed that CSX has never proceeded in that direction for its business.

In the circumstances of this case where the alleged conspiracy must be inferred from prior conduct, in the absence of evidence which tends to exclude the possibility that CSX's decision to deny trackage rights was unilateral with permissible business motives, the Court will grant CSX's motion for summary judgment.

Laurel Sand & Gravel finds itself in the unfortunate geographical happenstance of owning a quarry at a location that requires use of two different railroads to transport its product to its distribution center in Annapolis Junction. Pursuing the normal methods of transportation, i.e., by truck or by a joint line agreement between the two railroads, Laurel Sand & Gravel is not able to transport its stone as inexpensively as does Millville, which has its quarries better positioned geographically, at least with respect to railroad lines into Annapolis Junc-

tion. It is this geographical factor that has caused Laurel Sand & Gravel its difficulties. Nothing precludes it from developing its marketing strategy in a way that takes into account its geographical predicament, such as developing alternative distribution points at closer locations and using truck transportation. On the contrary, it has taken the location of its quarry and its distribution center as a given and determined that if it is to compete, CSX must alter its business to offer a product unlike any it has offered in the past. It has figured that if CSX rents its track for $.25 per ton, it will be able to compete with Millville even given its awkward geographical predicament. While the effort is creative, the refusal of CSX to comply does not constitute a violation of the antitrust laws.

### III.

### STANDING

■ CSX has also moved to dismiss the claims of Laurel Sand & Gravel because it is an indirect purchaser and therefore is not of the class of persons entitled to sue under § 4 of the Clayton Act.

Were Laurel Sand & Gravel suing to obtain a joint line transportation agreement or for damages because it could not obtain a reasonable rate, it would be a putative customer of both CSX and MMR. MMR would be the provider of transportation from the Barrick Quarry near Frederick to Emory Grove, and CSX would be the provider from Emory Grove to Annapolis Junction. The joint line agreement would make provision for a transfer of the transportation responsibility at Emory Grove and would specify a combined rate. Any antitrust violation arising out of a refusal to enter into that type of arrangement or out of an illegal charge made under that type of arrangement could very well damage Laurel Sand & Gravel in its business and property and give it standing to sue under § 4 of the Clayton Act.

The claim here made, however, is not in connection with a joint line agreement. Rather, Laurel Sand & Gravel claims that it has been damaged by the refusal of CSX

to grant trackage rights. Under this claim, the parties concede that Laurel Sand & Gravel would not be in a position to use trackage rights—it is not in the transportation business. Rather, it would contract with MMR, if trackage rights were to be given, for rail transportation for the entire trip from Frederick to Annapolis Junction, as if MMR owned the entire line. The track rights would be granted to MMR and MMR would resell them as part of its overall service of rail transportation of aggregates.

Under the claim as made, Laurel Sand & Gravel is an indirect, as distinguished from a direct, purchaser. MMR would rent track from CSX and then include that cost as well as its own costs and profit in charging Laurel Sand & Gravel a rate.

Section 4 of the Clayton Act does not permit both the direct purchaser and the indirect purchaser to sue for damages to his business or property. To permit both to sue would present the near impossible task of determining how much each person in a chain of distribution has been damaged and how much has been passed on to the next level, with the attendant risks of a duplicate award. It is now established that only those *directly* injured in their business and property may sue. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); and *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). As the Court in *Illinois Brick* stated:

> [T]he antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.

*Id.* 431 U.S. at 735, 97 S.Ct. at 2069.

Plaintiffs in this case, who are represented by experienced and qualified antitrust counsel of long standing, apparently recognized the standing difficulties of Laurel Sand & Gravel when they initially answered interrogatories in this action. Laurel Sand & Gravel stated in its answers:

LS & G does not intend to claim damages as a result of the refusal of CSXT to grant trackage rights to MMR from Emory Grove, Maryland, to Annapolis Junction, Maryland.

Likewise, MMR stated in answer to its interrogatories that:

> MMR's damages are distinct from LS & G's ... MMR's damages arise solely from CSXT's denial of trackage "rights" from the Emory Grove to Annapolis Junction....

Laurel Sand & Gravel now urges that it has standing for damages caused by loss of trackage rights; it is purportedly making its claim in reliance on the decision in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), where the Court stated:

> As we have recognized, "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236 [68 S.Ct 996, 1006, 92 L.Ed. 1328] (1948).

*Id.* at 472, 102 S.Ct. at 2545.

In *Blue Shield*, the Court permitted subscribers of Blue Shield to sue Blue Shield because it reimbursed the subscriber for psychiatric therapy when the therapy was performed by a psychiatrist, but not when it was performed by a psychologist. The Court held that the subscribers had standing to sue since they were direct purchasers from Blue Shield, even though the plan had been purchased by the employer and the services were provided by the psychologists. There was no risk of duplicate recovery as would be the case when the direct and indirect purchasers are both given the right to claim damages. As the Supreme Court in *Blue Shield* noted:

> The policies identified in *Hawaii* [*v. Standard Oil Co. of California*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972)] and *Illinois Brick* plainly offer no support for petitioners here. Both

cases focused on the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws. But permitting respondent to proceed in the circumstances of this case offers not the slightest possibility of a duplicative exaction from petitioners. McCready has paid her psychologist's bills; her injury consists of Blue Shield's failure to pay her. Her psychologist can link no claim of injury to himself arising from his treatment of McCready; he has been fully paid for his service and has not been injured by Blue Shield's refusal to reimburse her for the cost of his services.

*Id.* at 474–75, 102 S.Ct. at 2546.

In this case, Laurel Sand & Gravel would be suing for its share of the single damage caused by CSX to MMR. The Court would be left with a task of apportioning damage between MMR, the direct purchaser, and Laurel Sand & Gravel, the indirect purchaser, thereby creating the impermissible task of apportioning damages and risking duplicative recovery. *Blue Shield* left standing the doctrine of *Illinois Brick,* which is applicable here.

Thus, Laurel Sand & Gravel is not a person injured in its business or property as defined by § 4 of the Clayton Act. The Court therefore adopts this additional reason in dismissing the claims of Laurel Sand & Gravel against CSX.

## IV.

## SECTION 2 CLAIM

MMR, the only plaintiff in Count II, alleges that CSX's refusal to grant trackage rights to MMR for purposes of serving Laurel Sand & Gravel at a location on CSX's line constituted an improper exercise of monopoly power in violation of § 2 of the Sherman Act. It urges that the track from Emory Grove to Annapolis Junction is an "essential facility" or a "bottle neck" and that CSX, as a monopolist in control of the facility, cannot refuse access to MMR.

■ To establish a violation of § 2 of the Sherman Act in the context of the allegations made, MMR must show that CSX had monopoly power in a relevant market and deliberately engaged in exclusionary conduct to maintain, use, or extend that power. *See Otter Tail Power Co. v. U.S.,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *U.S. v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). An improper use of the monopoly power can be shown by demonstrating that the monopolist had no legitimate business reason for its conduct. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

The refusal of access by a monopolist to an "essential facility" that is controlled by the monopolist may constitute a willful maintenance of monopoly power in violation of § 2. To establish a violation of § 2 under the essential facilities doctrine, the plaintiff must show four elements: (1) control by the monopolist of an essential facility; (2) the inability of the competitor who is seeking access practically or reasonably to duplicate the essential facility; (3) the denial by the monopolist of the use of the essential facility to a competitor; and (4) the feasibility of providing the facility. *See MCI Communications v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1132–33 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

Tailoring these requirements to the circumstances of this case, in order to establish that CSX violated § 2, MMR must show that (1) CSX controlled an essential component of transportation of aggregates from Frederick to Annapolis Junction; (2) plaintiffs had no reasonable alternative to bypass the "bottleneck" controlled by CSX; (3) CSX effectively denied plaintiffs access to this component; and (4) to provide access would be reasonably feasible in the context of CSX's business and the railroad industry.

■ The essence of the violation is the use by a monopolist of his control over a "bottleneck" or an essential facility to

maintain or extend his monopoly into other markets by denying access to the essential facility to a competitor or potential competitor. The Sherman Act does not require a firm with monopoly power to engage in a joint marketing program or otherwise transact business with another firm if the purpose and effect of the action is not to maintain or extend its monopoly. *See Aspen*, 472 U.S. at 600, 105 S.Ct. at 2856 *et seq.*

In undertaking to establish the first element, that CSX is a monopolist in control of an essential facility, MMR urges that CSX controls the only rail line between Emory Grove and Annapolis Junction and that other methods of transportation are economically impractical. There is no dispute that CSX controls its own line from Emory Grove to Annapolis Junction and that if that line is the relevant market, it is a monopolist. CSX urges that the market is too narrowly defined. It pursued a "rock runner" service for years in order to gain entry into the market for transporting aggregates in the Baltimore–Washington corridor. Aggregates had theretofore been shipped by truck and by barge. When CSX began serving Millville for the first time, it was able to demonstrate that certain efficiencies could overcome other inflexibilities and permit rail service to compete. When viewing the market more broadly as including all transportation of aggregates in the Baltimore–Washington corridor, CSX notes that it possesses less than five percent of the relevant market, and therefore it is not and reasonably could not be expected to become a monopolist.

While the position of CSX is a reasoned one and appears to make more economic sense than the narrow market described by MMR, in the absence of receiving and evaluating the conflicting expert testimony on this point, the Court is not willing to dispose of that issue on summary judgment.

■ The second element that MMR must establish is that it cannot reasonably duplicate or pursue a reasonable alternative to the essential facility. This element has not been shown to the Court's satisfaction. It is of course unreasonable to suggest that MMR and Laurel Sand & Gravel should lay a duplicate track next to that of CSX. However, plaintiffs fail to address why CSX's offer to provide service over the line from Emory Grove to Annapolis Junction at $2.12 per ton does not provide a reasonable alternative. This rate is $.01 over CSX's variable cost (according to its calculations) and, in any event, is significantly lower than the rate it charges Millville. Although the charge may not be workable in plaintiffs' plans, the service offered is an alternative to trackage rights so long as it is offered on a reasonable basis.

To make a distinction between rail service from Emory Grove to Annapolis Junction and trackage rights for the same segment is conceptually artificial because either form of access provides rail transportation for that segment. Plaintiffs have charged that CSX monopolized a market consisting of *rail transportation* of aggregates to the Baltimore–Washington corridor, not a market defined by trackage rights.

■ Because the relevant product market alleged is rail transportation of aggregates, the third element that MMR must show, i.e., that access has been refused, also has not been satisfied. The facts are undisputed that CSX did not refuse its service. In order for plaintiffs to be able to claim that this offer of access at the rates proposed was a refusal, it would have to show that the rates offered were unreasonable and amounted to a denial of access. This plaintiffs have not undertaken to prove because, as discussed earlier in this opinion, any CSX rate for transportation service over $1.00 per ton would be economically infeasible for MMR and Laurel Sand & Gravel.

Any inquiry into the reasonableness of the rate offered by CSX must focus on the rate's reasonableness in the context of competition, rather than from plaintiffs' perspective. CSX is not responsible for the location of Laurel Sand & Gravel's quarry; it need not offer plaintiffs a rate below its costs in order to provide plaintiffs competitive transportation costs to Annapolis Junc-

tion. The Court concludes that in the circumstances of this case MMR would be unable to show that the rate offered was so unreasonable as to amount to a denial of access. The $2.12 per ton quotation was $.01 above CSX's variable cost and was well below the rate CSX charged Millville for shipping stone into Annapolis Junction, even though the Millville trips were longer. Furthermore, it is well within the zone of presumptive reasonableness established by Congress in the Staggers Act for rates that result in a revenue—variable cost percentage less than 180%. *See* 49 U.S.C. §§ 10701a(b)(1) and 10709(d)(2). While a question exists as to the propriety of applying that standard to a contract quotation (such as that involved here), it cannot be said that a zone of presumptive reasonableness established by Congress for tariff rates is not a standard to be considered when determining whether a contract quotation was so unreasonable as to amount to a denial of access. Under that standard, and using the variable cost of $1.72 per ton that was computed by plaintiffs' economist, an unreasonable rate would be one that exceeds $3.10 per ton. It is noteworthy that CSX contends that its $2.12 offer was essentially at cost, or $.40 over the variable cost suggested by plaintiffs. Using CSX's computation of its variable cost, any rate under $3.82 per ton would be within the zone of presumptive reasonableness. In either case, plaintiffs cannot show that the rate offered by CSX was so unreasonable as to amount to a denial of access to CSX tracks.

The fourth and final element that MMR must show to establish a violation of § 2 under the essential facilities doctrine is that to provide access to CSX's tracks would be reasonably feasible in the context of CSX's business. When considering this element, only the feasibility of granting trackage rights must be analyzed because access in the form of transportation service has already been offered by CSX.

It has not been disputed that CSX is in the business of providing rail transportation service. The plaintiffs' economist and the plaintiffs in their brief and pretrial order describe the relevant market in terms of "rail transportation of aggregate materials to the Baltimore–Washington market." The business of rail transportation, however, is quite distinguishable from the business of renting track, a business which plaintiffs wish CSX to enter with their request for trackage rights. The record contains ample business justification for CSX's decision not to enter the track renting business and also shows that entering this business would not be reasonably feasible.

Mr. Frederic Yocum, the Vice President of CSX who denied trackage rights to MMR, stated his reaction to MMR's request:

> It is not generally CSXT's practice to, and I know of no situation where, CSXT has granted line haulage trackage rights to a connecting railroad so that the connecting railroad could provide service to a point located on CSXT's line. That is precisely what MMR proposed. Had we acceded to the request, we undoubtedly would have received similar requests from the numerous other feeder lines with which we connect throughout our system. If this practice were to become widespread, we would have run the risk of changing, in a very basic way, the manner in which CSXT is operated, with very uncertain and potentially damaging results. CSXT would be diverted from the operating side of the railroad business and be relegated to the status of "toll taker."

Mr. Yocum also pointed to several business reasons why CSX would not take the business course requested, including: labor relations problems arising from displacing employees; safety considerations in having others operating on CSX tracks; congestion and practical interchange problems with having others operate at the same time that CSX operates on the same tracks; and altering normally established relationships with feeder lines. In short, a demand by MMR to have trackage rights, as distinguished from the transportation service offered by CSX, for the purpose of serving a location on CSX's line is simply a demand that CSX forfeit its business to MMR and resign itself to another business, that of

collecting track rent, with its attendant problems. Every shortline railroad would be entitled to demand similar treatment.

The Court concludes as a matter of law that it would not be feasible for CSX to provide trackage rights without altering the very basic nature of its permissible business and, indeed, the railroad industry. Thus, the fourth element that MMR is required to establish has not been satisfied.

The record in this case seems to support the overall conclusion that the aggregates market in the Baltimore–Washington corridor is a competitive one in which Laurel Sand & Gravel and Millville both compete. Millville has been able to obtain novel unit-train transportation agreements, based on CSX's normally offered services, that give it a competitive advantage over truck and barge transportation in some instances. Laurel Sand & Gravel would like to enjoy the same advantage, but because of the location of its quarry, it cannot take advantage of the normally offered services of MMR and CSX. Laurel Sand & Gravel and MMR are disadvantaged solely because of their geographical circumstance, and not because of any improper denial of access by CSX.

The Court thus concludes that the elements necessary to establish a violation of § 2 have not been demonstrated, and therefore the motion for summary judgment on Count II will also be granted.

Accordingly, for the reasons given in this Opinion, it is ORDERED that:

The motion of CSX for summary judgment is granted.