**DELAWARE & HUDSON RAILWAY COMPANY, Appellant,**

v.

**CONSOLIDATED RAIL CORPORATION, Appellee.**

**No. 1123, Docket 89–9034.**

United States Court of Appeals, Second Circuit.

Argued April 4, 1990.

Decided April 20, 1990.

James K. Manning (Elizabeth Storch, and Brown & Wood, New York City, on the brief) for appellant Delaware & Hudson Ry. Co.

Thomas E. Zemaitis, Philadelphia, Pa. (Laurence Z. Shiekman, Stephen J. Cipolla, Michael A. Ceramella, and Pepper, Hamilton & Scheetz, Philadelphia, Pa.; Scott A. Barbour, and McNamee, Lochner, Titus & Williams, Albany, N.Y.; Bruce B. Wilson, Constance L. Abrams and Consol. Rail Corp., Philadelphia, Pa., on the brief) for appellee Consol. Rail Corp.

Before FEINBERG, TIMBERS and WALKER, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Delaware & Hudson Railway Co. ("D & H") appeals from a summary judgment entered November 20, 1989 in the Northern District of New York, Neal P. McCurn, *Chief Judge*, in favor of appellant Consolidated Rail Corp. ("Conrail") in this antitrust action. 724 F.Supp. 1073 (N.D.N.Y.1989).

The district court found that D & H failed to raise a genuine issue of material fact with respect to any of its three claims, viz. monopolization, denial of an "essential facility" and attempted monopolization. On appeal, D & H asserts as error the district court's rejection of each of these three claims. It asserts that the court misconstrued the applicable law and, contrary to the approved practice at the summary judgment stage, failed to draw proper factual inferences in its favor.

After careful consideration, we hold that D & H's contentions are meritorious. For the reasons which follow, we vacate the judgment of the district court and remand the action.

### I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

A brief overview of recent developments in the freight railroad industry may help to place this dispute in context. Conrail was organized in the early 1970's in an effort to preserve the viability of freight transportation by rail in the northeastern and midwestern United States. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 108–09 (1974). Several large railroads, including the giant Penn Central, had become insolvent. Congress saw as the solution a single system run on a for-profit basis. *Id.* Subsequently, Conrail absorbed still more insolvent railroads.

D & H is a much older and smaller system than Conrail. It controlled about 1,700 miles of track at its peak, while Conrail controls about 17,000. Conrail does not challenge the fact that, as a result of the disparity, D & H is forced to rely on Conrail's system in order to compete. In the market involved on this appeal—shipment of newsprint from eastern Canada to locations in the mid-Atlantic states of this Country—only Conrail can provide transport from start to finish in most instances.

An example used by the district court and by both parties in their briefs may illustrate the parties' relationship: A newsprint shipper seeks to have newsprint delivered from a point in Quebec, Canada, to Lancaster, Pa. There are two relevant options. One option would entail delivery via a Canadian railroad to Conrail's border facility. Conrail then would carry the cargo on its tracks for the entire journey. Under the other option, after receiving the cargo at its border facility, D & H would carry the cargo on its tracks only as far as

Harrisburg, Pa. From there, it would have to complete the journey on Conrail's tracks.

Most of D & H's newsprint shipments therefore require the cooperation of Conrail. That cooperation takes the form of "joint rates". A joint rate is a cooperative rate—less than the sum of the separate rates of the individual railroads—charged to the shipper when the shipment requires the use of the tracks of two or more railroads. Each railroad's share of the rate usually is in proportion to the percentage of miles traveled on that railroad's tracks.

Until 1980, the Interstate Commerce Commission required cooperation in the setting of joint rates. In that year Congress moved to deregulate the railroads. The Staggers Rail Act of 1980, 49 U.S.C. § 10101 *et seq.* (1988), left to the railroads the decision whether or not to cooperate, albeit subject to antitrust and other laws. H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 83 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 4110, 4114.

The dispute leading to this appeal arose when Canadian shippers and railroads sought to lower rates so that rail carriage of newsprint could compete more readily with carriage by truck. Conrail agreed to lower its rates on trips where it was the sole American carrier. It did not decline outright to cooperate in cases where it was the secondary ("short haul") carrier to D & H, but instituted a policy, called "make or buy", that achieved the same effect. Under that policy, Conrail would agree to the reduced rate only if its profit, called "contribution", matched its profit on the route where it was the sole carrier.

The effect of the make or buy policy can be demonstrated by reference to the example referred to above. On a Quebec–Lancaster carriage entirely on Conrail tracks, Conrail would earn $30,000 in revenue, less $20,000 in costs, for a contribution of $10,000. Prior to the make or buy policy, Conrail's revenue for the Harrisburg–Lancaster short haul route, when D & H was responsible for the long haul, would be $2,000, less costs of $750, for a contribution of $1,250. The make or buy policy was intended to assure that Conrail would re-

ceive the same contribution for any carriage in which it participated, whether it was the short or long haul carrier. Accordingly, under its new policy, Conrail demanded a contribution of $10,000 for the Harrisburg–Lancaster short haul route, an increase of 800%. The price for D & H's failure to agree to those terms was the denial by Conrail of any joint rates.

Conrail's action placed D & H in a bind between giving up almost all of its profits on a given route and losing entirely the ability to carry freight on the route. It decided not to concur in joint rates where the make or buy policy was in effect. It commenced the instant action in July 1986. In June 1988, D & H sought protection under Chapter 11 of the United States Bankruptcy Code.

After surviving a motion to dismiss, 654 F.Supp. 1195 (N.D.N.Y.1987), and after extensive discovery, D & H's antitrust claims were rejected by the district court on Conrail's motion for summary judgment. The three claims, all of which relate to the same product market (shipment of newsprint from eastern Canada to the mid-Atlantic states) and the same conduct (Conrail's make or buy policy), are those set forth in the second paragraph of this opinion.

From the summary judgment rejecting these claims, this appeal was taken by D & H which asserts that, since there are genuine issues of material fact with respect to the three claims, summary judgment was improper. We agree.

II.

■■ On an appeal from a summary judgment, we review the record de novo to determine whether there are genuine issues of material fact. Fed.R.Civ.P. 56(c). We assess the record in the light most favorable to the non-movant and we draw all reasonable inferences in its favor. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2 Cir.1989). The non-movant, however, who must sustain the ultimate burden of proof, must demonstrate in opposing a summary judgment motion that there is some evidence which would create

a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). Conclusory allegations will not suffice to create a genuine issue. There must be more than a "scintilla of evidence," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986), and more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

### III.

We turn first to the question whether the make or buy policy constituted the offense of monopolization under § 2 of the Sherman Act, 15 U.S.C. § 2 (1988). To establish the defendant's liability, the plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71 (1966).

### (A)

■ Addressing the second element first, we must affirm the district court's ruling unless D & H has demonstrated that there is a genuine issue of material fact as to whether Conrail's make or buy policy constituted willful anti-competitive conduct in the relevant newsprint transportation market. Conrail's most significant contention in this regard is that, since the policy was intended to increase short-term, as well as long-term, profits, Conrail is insulated from liability.

Conrail finds support for this contention primarily in two opinions. The first is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985). There the Court affirmed a decision that the defendant had engaged in actionable conduct in its refusal to continue cooperating with a competitor. The Court held that a monopolist would not be liable merely because its actions adversely affected a competitor, if such actions were motivated by a valid business justification. *Id.* at 605. In determining that there was no valid justifica-

tion, the Court found significant the fact that the defendant "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610–11. Conrail infers from *Aspen Skiing* that conduct which has profit maximization as a goal cannot violate § 2.

Conrail finds further support for this contention in *United States Football League v. National Football League,* 842 F.2d 1335 (2 Cir.1988). There, we approved a jury instruction which included the following:

> "[A] monopolist is under no duty affirmatively to help or aid its competitors and is free to set as its legitimate goal the maximization of its own profits *so long as it does not exercise its power to maintain that [monopoly] power."*

*Id.* at 1361 (emphasis added).

■ The plain language of the above excerpt from *United States Football League* demonstrates that Conrail's contention is incorrect. The fact that profit maximization is a goal of the make or buy policy provides support for an argument that the policy is a legitimate practice, but does not shield the policy from judicial scrutiny. A monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits. *Aspen Skiing* does not hold to the contrary.

■ Our review of the record in the instant case satisfies us that there is evidence which would support a jury finding that Conrail is liable for monopolization. Here are a few examples: First, James Hagen, Conrail's former Senior Vice President—Marketing, stated that the refusal to concur in lowered joint rates would have been implemented whether or not it increased Conrail's profits. Second, several Conrail employees, including its President, Stuart M. Reed, stated that a shift of D & H's traffic to Conrail would be desirable. Third, David Kalapos, an analyst for Conrail, stated that D & H would be unlikely to concur in a joint rate under the make or buy policy as its profits "would be almost

ludicrously low." Fourth, there is no question that D & H was harmed by the implementation of the policy. D & H introduced in evidence a letter from a Conrail vice president stating "I'm for a monopoly in total! ... So let's Conrail take and rationalize the entire D & H."

■ We agree with the district court that the vice president's letter, standing alone, would not give rise to a § 2 violation. *Ocean State Physicians Health Plan v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1113 (1 Cir.1989), *cert. denied*, 110 S.Ct. 1473 (1990); *Olympia Equipment Leasing Company v. Western Union Tel. Co.*, 797 F.2d 370, 373, 379 (7 Cir.1986) (intent that "these turkeys ... be flushed" did not give rise to liability), *cert. denied*, 480 U.S. 934 (1987). In view of the evidence referred to above, however, we hold that D & H has proffered evidence sufficient to support a verdict in its favor by a reasonable jury on the question whether Conrail's conduct violated § 2. Obviously, therefore, this issue could not properly be decided against D & H on a motion for summary judgment.

### (B)

The district court assumed for purposes of argument that Conrail had monopoly power in the relevant market, transportation of newsprint from eastern Canada to the mid-Atlantic states. Conrail now asserts as an alternative ground for affirming the district court that this assumption was incorrect. D & H's evidence on the subject, it contends, was insufficient to create a triable issue.

■ D & H's expert witness, Gordon Fay, stated in an affidavit that Conrail had two-thirds of the market in rail transportation of newsprint and one-half of the total market (including truck transportation). While market share is not the sole factor in the determination of market power, it is a highly significant one. *Broadway Delivery Corp. v. United Parcel Service, Inc.*, 651 F.2d 122, 128 (2 Cir.), *cert. denied*, 454 U.S. 968 (1981).

■ The parties and the district court seem not to have devoted significant attention to the question of monopoly power. Conrail did not even take the deposition of the witness Fay. We are not presented with a well-developed record on that question. Nevertheless, on the record before us, we are persuaded that D & H has presented a genuine issue of material fact as to monopoly power, precluding summary judgment in favor of Conrail on this issue.

### IV.

■ We turn next to the question whether the make or buy policy constituted denial of an essential facility and, by implication, a violation of § 2. The alleged essential facility is Conrail's tracks used for short haul routes, e.g., the Harrisburg–Lancaster tracks in the hypothetical Quebec–Lancaster run. The district court rejected D & H's claim, relying on the four-factor test set forth in *MCI Communications v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132–33 (7 Cir.) ("(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility."), *cert. denied*, 464 U.S. 891 (1983); *see also Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568–69 (2 Cir.1990) (applying *MCI.*)

There is no question that Conrail controls the short haul tracks, thus satisfying the first element. With respect to the second element, we agree with the district court's statement that "physical duplication of [Conrail's] lines would be an impractical and unreasonable project to undertake." 724 F.Supp. at 1079. The fourth element, feasibility, is demonstrated by the fact that D & H was permitted continuous use of the tracks until the make or buy policy foreclosed that use.

The third element—whether Conrail impermissibly denied to D & H the use of the tracks—is the one on which the district court based its decision. The court held correctly that there need not be an outright

refusal to deal in order to find that denial of an essential facility occurred. It is sufficient if the terms of the offer to deal are unreasonable. In this context the following passage is particularly appropriate:

"Such plan of reorganization must also provide definitely for the use of the terminal facilities by any other railroad not electing to become a joint owner, upon such just and reasonable terms and regulations as will, in respect of use, character and cost of service, place every such company upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies."

*United States v. Terminal Railroad Assoc.*, 224 U.S. 383, 411 (1912); *see also* Areeda & Hovenkamp, Antitrust Law ¶ 736.1, at 700–01 (1989 Supp.).

We disagree, however, with the district court's conclusion that the terms of the make or buy policy were reasonable as a matter of law. We return to the earlier illustration to make the point clear. Prior to the implementation of the policy, Conrail received a contribution of $1,250 for D & H's use of its Harrisburg–Lancaster tracks. Under the policy, Conrail demanded a contribution of $10,000, an increase of 800%. The magnitude of that increase may be sufficient in itself to create a triable issue as to whether the terms were unreasonable. Whether it is or is not, however, the various statements of Conrail executives, excerpted above, support our conclusion that there is a triable issue.

The relatively sparse case law on this question supports our conclusion. In *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 704 F.Supp. 1309 (D.Md.1989), the court found that the defendant's offer to transport cargo for $.01 per ton above the defendant's own variable cost was reasonable. *Id.* at 1323–24. While it is difficult to extrapolate economic reasonableness from one case to another, we hold that a sudden price rise of 800% raises a genuine issue of material fact under *Laurel Sand.*

We need not determine on this appeal the circumstances under which a legitimate business practice will shield a defendant from liability for conduct that otherwise would constitute denial of an essential facility. *MCI, supra,* 708 F.2d at 1133 (suggesting that a legitimate practice may serve as a shield from liability). In our discussion above on the monopolization claim, we held that there is a genuine issue of material fact with respect to the question whether the make or buy policy was a legitimate practice. That holding is equally applicable here.

## V.

■■■■■ D & H also contends that the make or buy policy constituted the § 2 offense of attempted monopolization. To make out a successful claim of attempted monopolization, a plaintiff must demonstrate: (1) anti-competitive conduct; (2) intent to monopolize; and (3) a dangerous probability of obtaining monopoly power. *International Distrib. Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 790 (2 Cir.), *cert. denied,* 482 U.S. 915 (1987). These elements essentially track those required for a successful monopolization claim. We held with respect to the monopolization claim that the development and implementation of the make or buy policy raised triable issues on the questions of conduct and intent. Likewise, evidence of Conrail's monopoly power that is sufficient to withstand a motion for summary judgment also suffices to raise a triable issue as to whether there was a dangerous probability that Conrail would obtain monopoly power.

## VI.

To summarize:

We hold that there are genuine issues of material fact with respect to whether the development and implementation by Conrail of its make or buy policy constituted the antitrust offenses of monopolization, denial of essential facilities and attempted monopolization.

Nothing in this opinion is to be construed as an expression of our views on the merits of the issues to be tried. All we hold today is that there are genuine

issues of material fact which should not be decided by summary judgment.

Reversed and remanded.