BROADCAST MUSIC, INC.; Cotillion Music, Inc.; Irving Music, Inc.; Screen Gems–EMI Music, Inc.; Embassy Music Corporation; Michael Joe Jackson d/b/a Mijac Music; Stone Agate Music, Division of Jobete Music Co., Inc.; Cedar–wood Publishing, a Division of Dick James Music, Inc.; Peer International Corporation; Tree Publishing Co, Inc.; Melody Jean Craddock d/b/a Bopping Music Company; Lowery Music Company, Inc.; Dorinda Morgan, as Trustee of the "Hite Morgan and Dorinda Morgan 1974 Trust" d/b/a Guild Music Company; Dick James Music, Inc.; and Michael Jackson d/b/a Maclen Music, Plaintiffs and Counterclaim Defendants,

v.

HEARST/ABC VIACOM ENTERTAINMENT SERVICES d/b/a Lifetime Television, Defendant and Counterclaim Plaintiff.

HEARST/ABC VIACOM ENTERTAINMENT SERVICES d/b/a Lifetime Television, Defendant and Third–Party Plaintiff,

v.

Frances W. PRESTON, Third–Party Defendant.

No. 89 Civ. 2833 (JFK).

United States District Court, S.D. New York.

Aug. 29, 1990.

Hughes Hubbard & Reed, New York City; Robert J. Sisk, Michael E. Salzman, Charles Lozow, and Mary K. Fleck, of counsel, for plaintiffs-counterclaim defendants and third-party defendant.

Weil, Gotshal & Manges, New York City; R. Bruce Rich, Kenneth L. Steinthal, Geoffrey M. Green, Evie C. Goldstein, and Beth K. Neelman, of counsel, for defendant-counterclaim plaintiff and third party plaintiff.

## OPINION AND ORDER

KEENAN, District Judge:

This copyright infringement action is before the Court on plaintiffs' motion to dismiss the three-count antitrust and copy-

right misuse counterclaim and to strike the affirmative defenses of defendant Hearst/ABC Viacom Entertainment Services d/b/a Lifetime Television ("Lifetime"). Fed.R.Civ.P. 12(b)(6), (f). Frances W. Preston also moves to dismiss the third-party complaint against her. For the reasons discussed below, the Court grants in part and denies in part plaintiffs' application. The third-party complaint is dismissed with leave to re-plead.

## BACKGROUND

Plaintiff Broadcast Music, Inc. ("BMI") is engaged in the business of licensing performing rights in the copyrighted musical compositions of its affiliated composers and publishers. BMI currently represents over 53,000 affiliated composers and over 32,000 affiliated publishers who have granted BMI non-exclusive authority to license the performing rights in over 1.5 million musical compositions. Where the authority to license performing rights is non-exclusive, the copyright owner retains the right to license his works individually or on a catalogue-wide basis as if BMI did not exist. After BMI issues a license to a music user,[1] it collects the license fees and distributes all royalties to the composers and publishers after expenses and allowances for cash reserves. BMI also monitors unlicensed or unauthorized performances of music and, when able to join the copyright owner, brings infringement actions.

The thousands of individual copyright owners who have appointed BMI as their licensing agent have also authorized BMI to determine the types of licenses that it will offer and the prices at which these licenses will be available. BMI licenses its repertoire on an aggregate basis. That is, it issues a blanket license which entitles the licensee to use any or all of the works in the BMI repertoire as often as desired during the license term. The license is typically conveyed for a fee reflecting a percentage of the user-licensee's revenue. In the television and radio field, BMI also offers a "per program" license which measures license fees based upon the popularity of particular programs or the time-periods in which BMI music is heard.

Lifetime is a cable television program service (in cable television parlance a "cable supplier") that acquires, produces and markets video programming to subscribers, primarily through cable system operators located across the United States. Lifetime is available to tens of millions of Americans each day on their home televisions.

Like most other cable television program services, Lifetime produces little original programming. The bulk of its programming consists of theatrical movies and other pre-recorded programs which are licensed or purchased by Lifetime from third-party syndicators. Most of this programming features copyrighted music, which is selected by the program producer and recorded on the program soundtrack. The music is thus permanently integrated into the program and the cable service wishing to transmit the program must either transmit whatever music is incorporated in the program or not broadcast the program at all.

A pre-recorded television program or theatrical motion picture represents the collaborative efforts of numerous individuals: composers, actors, directors, editors, etc. In the cable television industry, all copyright rights—save one—are secured by the program suppliers at the time of production and are transferred to the broadcasting cable service as part of the program package. The one exception to this practice concerns the licensing of music performing rights. These rights are not obtained and conveyed by the producer/syndicator, but are reserved by the copyright owner or other licensor (such as BMI) for licensing in separate transactions with the cable program services.

Defendant alleges that cable television music performing rights are not negotiated and licensed in a transaction between the producer and composer "at the source" be-

---

1. BMI licenses the works in its repertoire to the three major television networks, cable program suppliers, and thousands of local television and radio stations. Other licensees include concert halls, nightclubs, bars and skating rinks.

cause the copyright proprietors who are BMI affiliates prefer that the cable services deal with their licensing agent, BMI. The result of this, defendant contends, is that each cable service is required to purchase, through the blanket license, performing rights in all of the music in BMI's repertoire without regard to the service's needs.

Defendant maintains that the alternative of licensing performing rights directly from the copyright owner is a Hobson's choice. The blanket license system, defendant submits, eliminates any incentive for BMI's affiliates to license their works directly. BMI's affiliates are insulated from the negotiations fostered by a competitive marketplace and assured the benefits of what defendant characterizes as "BMI's take-it-or-leave-it licensing tactics." Moreover, defendant claims that it would be prohibitively expensive to locate and obtain licenses from individual composers and publishers.

Plaintiffs allege that Lifetime has for several years willfully infringed numerous copyrights of musical compositions in the BMI repertoire by publicly performing them without a license from either BMI or the individual copyright owners. See 17 U.S.C. § 106(4) (1977 & Supp.1990). When plaintiff first became aware of the alleged copyright violations, it proffered an annual blanket license to Lifetime for a fee calculated at one percent of Lifetime's gross revenues. Lifetime claims that the proffered fee would be three to four times greater than the blanket license fee charged to BMI's "pay" cable television,[2] broadcast network and local broadcast station licensees. Lifetime rejected the blanket license offer and this suit followed.

### The Consent Decree

In 1964, the United States commenced an anti-trust action against BMI alleging violations of the Sherman Anti-Trust Act. In 1966, the United States District Court for the Southern District of New York entered a consent decree in that action, see United States v. Broadcast Music, Inc., [1966] Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y.1966), which prohibits BMI from discriminating among similarly situated music users. The second major music licensing society in the United States, the American Society of Composers, Authors and Publishers ("AS-CAP")[3] is governed by a separate consent decree which provides for a "rate court." If any music user cannot negotiate an agreeable license with ASCAP, the user may apply to the district court supervising the decree to fix a reasonable fee. BMI's licenses, on the other hand, are granted through private bargaining alone.

### DISCUSSION

A motion to dismiss for failure to state a claim may be granted only if it appears certain that no relief could be granted under any set of facts that could be proved consistent with the allegations. See Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); Lipsky v. Commonwealth United Corp., 551 F.2d 887, 894 (2d Cir.1976); Burger v. Health Ins. Plan of Greater New York, 684 F.Supp. 46, 49 (S.D.N.Y. 1988). The factual allegations set forth in the complaint or counterclaim must be accepted as true, see Zinermon v. Burch, —— U.S. ——, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990), and the Court must view the allegations in the light most favorable to the pleader. See Scheuer v. Rhodes, 416 U.S. 232, 237, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974); Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 562 (2d Cir.1985). Even if it appears on the face of the pleadings that recovery is remote, the claim will withstand the motion

---

**2.** "Pay" cable program services typically are offered by cable system operators to subscribers for a monthly premium over the basic monthly cable service fee. Lifetime's cable service is labelled "basic" because it is generally offered by cable operators to subscribers as part of a routine cable package.

**3.** Virtually every domestic copyrighted composition is in the repertory of either ASCAP or BMI, but not both. Consequently, defendant asserts, ASCAP and BMI do not compete in the same marketplace. Lifetime must, as a practical matter, seek license relationships with both organizations.

to dismiss as long as the pleader retains a possibility of success. *Scheuer,* 416 U.S. at 237, 94 S.Ct. at 1686–87. To this landscape must be added the caveat that "dismissals on the pleadings are especially disfavored in antitrust cases." *Schwartz v. Jamesway Corp.,* 660 F.Supp. 138, 141 (E.D.N.Y.1987) (citing *Hospital Bldg. Co. v. Rex Hosp. Trustees,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976)).

### Section 1 of the Sherman Act

■ Defendant alleges violation of section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1 (1982 & Supp.1990) in count I of its counterclaim. Section 1 forbids "[e]very contract, combination ... or conspiracy in restraint of trade or commerce among the several States." The section 1 claimant must demonstrate (1) concerted action by two or more persons which (2) unreasonably restrains interstate trade or commerce. *See Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 837 (S.D.N.Y.1988). *Accord International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 793 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). "Unlike the proof required to establish a conspiracy to monopolize under section 2, a specific intent to create a monopoly is not required under section 1." *Walsh Trucking,* 812 F.2d at 793.

■ Defendant maintains that the non-exclusive agreements between BMI and its affiliates, which permit the use of the blanket license, represent a concerted effort to increase the prices of music performing rights and to restrict the market choices available to cable program services. Plaintiffs portray defendant's counterclaim and affirmative defenses as substantively identical to a series of earlier profitless challenges to the blanket license, particularly *Buffalo Broadcasting Co. v. American Soc'y of Composers, Authors and Publishers,* 744 F.2d 917 (2d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985). *Buffalo Broadcasting* involved a challenge under section 1 of the Sherman Act by a class of local television stations to the blanket licenses offered by BMI and ASCAP. After a bench trial, Judge Gagliardi ruled that the blanket license was an unreasonable restraint of trade. The Second Circuit reversed, ruling that the class had not established that the blanket license restrained trade.

Writing for a unanimous panel, Judge Newman concluded that given the availability of realistic licensing alternatives, the blanket license had no anti-competitive effect upon local television stations wishing to purchase music performing rights. *See id.* at 926–33. Plaintiffs argue that this ruling foreclosed all future challenges to the blanket license as an unreasonable restraint of trade. The Court disagrees.

Plaintiffs' position misapprehends the plain import of the Second Circuit's decision. Several passages from Judge Newman's opinion bear out this point. In the decision's preface, Judge Newman wrote:

> "For reasons that follow, we conclude that the evidence was insufficient as a matter of law to show that the blanket license is an unlawful restraint of trade *in the legal and factual context in which it currently exists.*"

*Id.* at 919 (emphasis added). In discussing the precedential effect of *BMI, Inc. v. CBS, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979),[4] Judge Newman wrote: "[t]he fact that CBS did not prove that blanket licensing of networks restrained competition does not necessarily mean that blanket licensing of local stations may not be shown to be a restraint." *Id.* at 925. If any confusion over the significance of *Buffalo Broadcasting* lingered, Judge Newman erased it in the penultimate sentence of the opinion:

> "Without doubting that the context in which the blanket license is challenged can have a significant bearing on the outcome, we hold that the local television stations have not presented evidence in this case...."

4. In *BMI,* the Supreme Court held that the blanket license is not a *per se* section 1 violation.

*Id.* at 933.[5]

Because the blanket license is not *per se* unlawful, *see BMI, Inc., supra,* 441 U.S. at 20, 99 S.Ct. at 1562–63, whether it constitutes an unreasonable restraint of trade is determined under the rule of reason.[6] As explained by the Supreme Court, " 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.' " *Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) (citation omitted). Here, an array of factual issues await the crystallizing effect of discovery, including the history of music licensing to cable program services, BMI's reasons for insisting upon the blanket license for cable program services, the presence of disincentives to individual copyright proprietors to market their compositions separately, the concomitant absence of alternatives available to cable program services and the effect of the blanket license on the availability and prices of music performing rights for cable program services.

■ If plaintiffs' challenge to the sufficiency of defendant's antitrust allegations were governed by the more stringent requirements of Fed.R.Civ.P. 9(b), a different result might obtain. *See Christian Broadcasting* Tr. at 6. Antitrust allegations, however, are governed by the "short and plain statement" requirement of Rule 8(a). Defendant has pleaded sufficient allegations of the material elements of a section 1 violation to survive a motion to dismiss.

### Section 2 of the Sherman Act

■ Section 2 of the Sherman Act, 15 U.S.C. § 2 (1982 & Supp.1990), affords a basis for three distinct civil claims, each of which defendant alleges: (1) monopolization; (2) attempted monopolization; and (3) conspiring to monopolize. *See Medtronic, supra,* 687 F.Supp. at 837.

■ To establish a monopolization claim, the claimant must demonstrate monopolizing conduct coupled with monopoly power in the relevant market. *See Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990). Monopolizing conduct is " 'the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " *Id.* (quoting *United States v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)); *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 602, 105 S.Ct. 2847, 2857, 86 L.Ed.2d 467 (1985) (describing monopolizing conduct as "exclusionary" or "predatory"). This requirement is in keeping with the cornerstone precept of antitrust law that competition is to be safeguarded, not competitors. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Kelco Disposal, Inc. v. Browning–Ferris Indus.,* 845 F.2d 404, 411 (2d Cir.1988), *aff'd,* —— U.S. ——, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989); *Medtronic,* 687 F.Supp. at 838.

■ Defendant alleges that plaintiffs and their affiliates have agreed to accord BMI absolute authority to determine the types of licenses it will offer and the prices at which these licenses will be offered. Defendant further asserts that the affiliates have determined not to license their rights directly, thereby enabling plaintiff to employ the purportedly anti-competitive

---

**5.** The Court does not dispute that Judge Winter, who concurred in *Buffalo Broadcasting,* maintains that absent evidence of agreement among composers or producers to refrain from licensing performing rights independently, "a non-exclusive blanket license cannot restrain competition." *Id.* at 934 (Winter, J., concurring). The majority decision of the panel, however, is not that broad. *See BMI, Inc. v. The Christian Broadcasting Network, Inc.,* 89 Civ. 6246 (JES) (Transcript of May 11, 1990 Oral Argument on BMI's motion to dismiss identical antitrust counterclaims of another basic cable television program service, pp. 8–9).

**6.** As acknowledged by the *Buffalo Broadcasting* majority, virtually no alleged concerted action has ever been ruled lawful *per se. See* Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6, 23 and n. 62 (1981).

blanket license. Counterclaim ¶ 22. Accepting this assertion as true, the Court believes defendant has depicted a "pernicious market structure in which concentration of power saps the salubrious influence of competition." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). *Cf.* L. Sullivan, *Handbook of the Law of Antitrust* 107 (1977) (concerted action which enables wielding of monopoly power constitutes monopolization act in violation of section 2). Defendant has pleaded the requisite conduct that is exlusionary of competition.

■ Monopolizing power "is a matter of capacity—the possession of power to control prices or exclude competition." *Id.* at 30. Before monopoly power may be assessed, the relevant geographic and product markets must be defined. *See Speed Auto Sales, Inc. v. American Motors Corp.*, 477 F.Supp. 1193, 1197 (E.D.N.Y. 1979). "Rule 8 does not require that a [claimant] 'define specifically the boundaries of its purported market'.... Questions of market definition can be narrowed and determined through the discovery process." *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 552 F.Supp. 327, 331 (S.D.N.Y. 1982). Here, the relevant product market is apparent: copyrighted musical compositions in BMI's repertoire.

The relevant geographic market is a national one, as BMI offers licenses to cable services across the country. Finally, defendant easily satisfies the requirement of pleading monopoly power within the relevant market. The majority of domestic copyrighted compositions are in either ASCAP or BMI's repertoire, but not in both. Crediting defendant's allegations, a cable service wishing to transmit a program featuring a composition in BMI's repertoire must apply to BMI for the right.

■ An attempted monopolization claim under section 2 of the Sherman Act comprises three elements: "(1) anticompetitive conduct; (2) intent to monopolize; and (3) a dangerous probability of obtaining monopoly power." *Delaware & Hudson Railway*, *supra*, 902 F.2d at 180; *see Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 85 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). "These elements essentially track those required for a successful monopolization claim." *Delaware & Hudson Railway*, 902 F.2d at 180. Having determined defendant has pleaded a colorable monopolization claim, the same ruling applies *a fortiori* to the attempt claim. *Id.*

■ The conspiracy to monopolize claim entails two components: " '(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.' " *Walsh Trucking, supra*, 812 F.2d at 795 (citation omitted). Defendant need not allege that the intended monopoly succeeded in any way; the agreement to restrain trade or monopolize plus the overt act in furtherance of the agreement complete the offense. *Id.* at 796 n. 8. Only "a bare bones statement of conspiracy or injury under the antitrust laws without any supporting facts permits dismissal." *Heart Disease Research Found. v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972).

■ Viewing the allegations in the light most favorable to defendant, the counterclaim alleges an agreement between BMI and its affiliates which facilitated the purportedly anti-competitive blanket license, and that BMI has unreasonably offered only the blanket license to defendant in furtherance of the agreement to deprive music users of less costly licensing arrangements.

### Copyright Misuse Counterclaim and Affirmative Defense

■ The third count of the counterclaim seeks a declaratory judgment that plaintiffs "have misused, extended and enlarged the copyrights they license and such copyrights are ... unenforceable until such misuse is purged...." Similarly, defendant's third affirmative defense asserts that plaintiffs' alleged copyright misuse

**328**

bars recovery on their claims. The parties agree that the so-called patent misuse doctrine allows a court of equity to refuse protection of a patented invention when the patentee uses his lawful monopoly over the patented invention to assert economic control over unpatented products. *See, e.g., Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 136–40, 89 S.Ct. 1562, 1583–86, 23 L.Ed.2d 129 (1969). In *United States v. Loew's, Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962), the Supreme Court recognized that copyright owners may sometimes gain comparable market dominance over their copyrighted articles, enabling them to assert economic control over uncopyrighted products. The Court did not, however, use the opportunity to create a copyright misuse doctrine.

The copyright misuse doctrine has been ill-received in the lower courts. Some courts have flatly rejected the existence of the doctrine. *See, e.g., Rural Tel. Serv. Co., Inc. v. Feist Publications, Inc.,* 663 F.Supp. 214, 220 (D.Kan.1987); *Orth–O–Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 686 (S.D.N.Y.1979). Others, while recognizing the defense, have rejected its application on the facts. *See United Tel. Co. of Missouri v. Johnson Publishing Co., Inc.,* 855 F.2d 604, 611–12 (8th Cir. 1988) (compiling cases); *Broadcast Music, Inc. v. CBS,* [1983–2] Trade Cas. (CCH) ¶ 65,551 (S.D.N.Y.1983) (holding that copyright misuse defense unlikely to succeed on the merits). The Court's research discloses no case where the misuse of a copyright prevented recovery on an infringement claim.

Defendant alleges that BMI has used its legal monopoly power to force cable program services to purchase the blanket license at exorbitant prices. If proven, this would constitute an illegal extension of BMI's monopoly. Although recovery appears remote, the Court is persuaded by the more recent cases that the affirmative defense of copyright misuse is cognizable.

The Court rejects, however, defendant's assertion of the copyright misuse doctrine as a vehicle for affirmative relief. Such a claim is unprecedented and the Court declines to create the claim. Therefore, the Court dismisses count three of the counterclaim.

*Public Performance*

■ Defendant claims in its first affirmative defense that the complaint must be dismissed because it does not publicly perform the musical compositions which are the subject of the complaint. Rather, Lifetime asserts that it transmits its programming to cable operators who in turn relay the signal to the television sets of its viewers. Thus, the argument runs, only the cable operators publicly perform the compositions.

■ Public performance of the copyrighted composition is an element of a *prima facie* copyright infringement claim.[7] Under the Copyright Act, public performance is defined as either (1) performing the work "at a place open to the public.... or (2) "transmit[ting] or communicat[ing] a performance ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101 (1977 & Supp.1990). Plaintiffs submit that the second definition encompasses defendant's provision of programming services to cable system operators. The Court agrees.

Judge Tenney thoroughly addressed this precise question in *David v. Showtime/The Movie Channel, Inc.,* 697 F.Supp. 752 (S.D. N.Y.1988). After parsing the statute and reviewing the pertinent legislative history, Judge Tenney concluded:

"it seems apparent from the scope of the examples provided in the legislative history that Congress intended the defini-

---

7. A copyright plaintiff must make sufficient allegations concerning (1) originality and authorship of compositions; (2) compliance with formalities required to secure a copyright; (3) ownership of the copyrighted compositions; and (4) unauthorized public performance of the copyrighted compositions by defendant. *See Boz Scaggs Music v. KND Corp.,* 491 F.Supp. 908, 912 (D.Conn.1980). Defendant challenges only the fourth element.

tions of public and performance to encompass each step in the process by which a protected work wends its way to its audience. Moreover, it would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on the mere method by which television signals are transmitted to the public."

*Id.* at 759.

The Court dismisses the affirmative defense that no public performance has occurred.

### Equitable Estoppel and Unclean Hands

As a second affirmative defense, defendant asserts that BMI is equitably estopped from bringing its copyright infringement claim by virtue of anticompetitive and unlawful behavior. The fourth affirmative defense alleges that the same behavior constitutes unclean hands barring recovery. Although the two doctrines raised by these affirmative defenses have considerable overlap, the Court will discuss them separately.

"[E]quitable estoppel applies both in law and in equity to deny a party the right to plead or prove an otherwise important fact —here, the act of infringement—because of something he has done or omitted to do." *Tempo Music, Inc. v. Myers,* 407 F.2d 503, 507 n. 8 (4th Cir.1969). In *Tempo,* upon which defendant's argument in large measure relies, the Court estopped plaintiff from recovering on its copyright infringement claim because ASCAP, plaintiff's licensing agent, significantly caused the infringement. The defendant supper club in *Tempo* had sought to avoid infringing the copyrights in songs in ASCAP's repertoire by requesting from ASCAP a list of the songs in its repertoire. Although the consent decree governing ASCAP required it to provide such a list on request, ASCAP declined to furnish the list to defendant, who then inadvertently violated certain of plaintiff's copyrights.

■■■ Crucial to application of the doctrine of equitable estoppel in the copyright infringement context, therefore, is at least partial responsibility of the party

seeking recovery for the alleged infringement. *See Broadcast Music, Inc. v. CBS, Inc.,* [1983–2] Trade Cas. ¶ 65,551 at 68,745 (S.D.N.Y.1983). Defendant maintains that BMI brought about Lifetime's unlicensed status and the alleged copyright violations by refusing to offer a reasonable license and precluding realistic alternatives. Reading the counterclaim's allegations in the light most favorable to defendant, the Court believes that defendant has alleged the type of direct causation that led the *Tempo* Court to relieve an infringer of liability.

The Fourth Circuit characterized the *Tempo* defendant's position as "impossible" because it could only avoid infringement by playing no music at all or by paying what it regarded "as an exorbitant licensing fee." *Tempo,* 407 F.2d at 506. Plaintiffs argue that defendant's failure to attempt to avoid playing music from the BMI repertoire or to obtain licenses directly from individual owners is fatal to its assertion that BMI in part "caused" the alleged violations. Crediting Lifetime's assertion that it would be unable to obtain licenses directly, it is fatuous to suggest that Lifetime could remain a competitive cable service while unable to transmit programming containing any of the over 1.5 million compositions in BMI's repertoire. The Court cannot dismiss the equitable estoppel affirmative defense at this stage.

■■■ The unclean hands doctrine "is a limited device, invoked by a court only when a plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent defendant's tortious conduct." *Playboy Enter., Inc. v. Chuckleberry Publishing,* 486 F.Supp. 414, 435 (S.D.N.Y.1980). The defense of unclean hands in copyright actions is "recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action." 3 M. Nimmer, *Nimmer on Copyright,* § 13.09[B] at 13–145 (1988). This doctrine is peculiarly fact-specific, rendering dismissal on the skeletal

basis of the pleadings inappropriate. Moreover, the Court's observations concerning dismissal of the equitable estoppel affirmative defense on the pleadings apply with equal force to the unclean hands application. *See supra* pp. 19–20.

### Dismissal of the Third–Party Complaint

Defendant alleges that Frances W. Preston, the President and Chief Executive Officer of BMI, "has authorized the unlawful conduct of BMI" asserted in the counterclaim and affirmative defenses. Paragraph 13 of the Counterclaim and Third–Party Complaint, which contains the sole direct reference to Preston, purports to incorporate Preston into all references to BMI or counterclaim defendants in the pleading. Preston moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the third-party complaint. *See Kenneth Leventhal & Co. v. Joyner Wholesale Co.*, 736 F.2d 29 (2d Cir.1984).

Preston advances a congeries of arguments in urging dismissal of the third-party-complaint. Her first argument concededly rises and falls with BMI's motion to dismiss the antitrust claims pressed against it. Therefore, this argument is unavailing.

■ Preston next correctly points out that officers and employees of a corporation cannot conspire with the corporation for purposes of the joint action essential to a violation of section 1 of the Sherman Act. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *Gucci v. Gucci Shops, Inc.*, 651 F.Supp. 194, 197 (S.D.N.Y.1986). Defendant does not claim, however, that the requisite concerted action derives from an agreement between Preston and BMI. The plurality of actors alleged to have agreed to violate the antitrust laws consists of BMI and its thousands of affiliates. Further, it is firmly settled that officers and employees of a corporation "may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts." *Brown v. Donco*

*Enter.*, 783 F.2d 644, 646 (6th Cir.1986); *see Tillamook Cheese & Dairy Ass'n v. Tillamook Co. Cream Ass'n.*, 358 F.2d 115, 118 (9th Cir.1966). A more fundamental defect impairs the third-party complaint.

■ Fed.R.Civ.P. 14(a), which governs third-party impleader, provides in relevant part:

"a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action *who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff* (emphasis added)."

Thus, in order for Lifetime to assert a third-party claim, it must be "attempting to transfer to the third-party defendant liability that may be imposed upon [it] in the main action." *Tri–Ex Enter., Inc. v. Morgan Guaranty Trust Co.*, 586 F.Supp. 930, 932 (S.D.N.Y.1984).

Lifetime may properly assert a third-party complaint against Preston only if she is or may be liable to Lifetime for all or part of Lifetime's copyright infringement liability to BMI. The only ways the Court can conceive Preston could be a proper third-party defendant would be if she were a co-infringer or a contributory infringer of the copyrights in BMI's repertoire. Plainly she is not. Accordingly the third-party complaint is dismissed.

■ Conceding its error, Lifetime maintains that Preston may be properly joined as a counterclaim defendant pursuant to Fed.R.Civ.P. 13 and 20. Rule 13(h) provides that "persons other than those made parties to the original action may be made parties to a counterclaim or crossclaim in accordance with … Rules 19 and 20." Rule 20(a) permits the joinder as defendants of all persons against whom is asserted any claim arising out of the same transaction "and if any question of law or fact common to all defendants will arise in the action." Since Lifetime seeks to allege the same wrongdoing against BMI and Preston, Rule 20(a) is satisfied and Preston may be joined as a counterclaim defendant.

Lifetime must, of course, amend its answer. Curative assertions in memoranda do not effect the amendment. *See Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 526 (S.D.N.Y.1977). The Court suggests that in drafting its amended counterclaim, Lifetime apply particular attention to removing the peculiarities in the present answer occasioned by wholesale incorporation-by reference.[8]

## CONCLUSION

For the reasons explained above, the Court grants and denies in part BMI's motion to dismiss. Lifetime is directed to file an amended counterclaim within 20 days of this decision. Reciprocal discovery is to proceed. The parties are to appear for a status conference on November 5, 1990 at 11:00 a.m. in courtroom 228.

SO ORDERED.

---

**8.** For example, a plain reading of the present pleading reveals such bemusing allegations as: BMI and Preston each have composers and publishers as affiliates, BMI and Preston each control the copyrights which BMI licenses, BMI and Preston were both sued by the United States in 1964, and both BMI and Preston possess unrestrained ability to exert enormous market power.