Tomas **FAY, Robert Burns, Frederick J. Harjes, Nicholas Metakis, Richard DeChiaro, Nunzio Martino, Steve Coticchio and Frank Giovinazzo, Plaintiffs,**

v.

**TEAMSTERS LOCAL UNION NO. 553, IBT, AFL—CIO, William Ness, President of Local Union No. 553, IBT, AFL—CIO, Bernard Pelligrino, Secretary–Treasurer of Local Union No. 553, IBT, AFL—CIO, Petro, Inc., Reliance Utilities, Inc. and Reliance Associates Corp., Defendants.**

No. CV 97–0692(DRH).

United States District Court, E.D. New York.

March 4, 1999.

88

John J. Leo, New York City, for plaintiffs.

Friedman & Levine, New York City, by Bruce S. Levine, for defendants Teamsters Local Union No. 553, IBT,. AFLO—CIO, William Ness and Bernard Pelligrino.

Littler Mendelson, P.C., New York City, by A. Michael Weber, for defendants Petro, Inc., Reliance Utilities, Inc. and Reliance Associates Corp.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Pending before the Court are the motions of (1) Defendants Teamsters Local Union No. 553, IBT, AFL—CIO ("Local 553"), William Ness, President of Local 553 and Bernard Pelligrino, Secretary–Treasurer of Local 553 (collectively the "Union Defendants") and (2) Defendants Petro, Inc., ("Petro") Reliance Utilities, Inc. ("Reliance") and Reliance Associates Corp. ("RAC") (collectively the "Employer Defendants") for summary judgment on Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure ("Rule") 56(b). For the reasons that follow, the motions are granted.

### BACKGROUND

The following facts are undisputed. In 1996, Petro owned five separate retail fuel oil companies in Nassau and Suffolk Counties, including Reliance and RAC. (Union Defs.' Rule 56.1 Statement ¶¶ 4–5.) Petro purchased Reliance in 1981; Reliance was operated as a wholly-owned subsidiary until 1992, at which time it was consolidated with Rite Fuel, another Petro wholly-owned subsidiary. (Pls.' Rule 56.1 Statement ¶ 4; Deposition of Justin McCarthy, dated July 8, 1997 ("McCarthy Dep."), at 11 (annexed as Ex. D to Declaration of Bruce S. Levine, dated December 17, 1997 ("Levine Decl.")).) After the consolidation of Reliance and Rite Fuel, the entity continued to be known as Reliance. (Pls.' Rule 56.1 Statement ¶ 4.) Petro acquired RAC in 1992; RAC operated as a separate entity until in or about July 1996. (Pls.' Rule 56.1 statement ¶¶ 8, 12; McCarthy Dep. at 12.) Until in or about July 1996, Reliance and RAC operated independently. (Pls.' Rule 56.1 Statement ¶ 12.) RAC drivers on occasion would park their trucks at the Reliance facility for convenience purposes.[1] (Deposition of Demos

---

1. The Reliance facility was located in Hicksville, while the RAC facility was located in Patchogue. Demos Demopoulos, Local 553's business agent and recording secretary, explained that RAC drivers would sometimes park their trucks at the Reliance facility when they were performing work in Nassau County proximate to the Reliance facility. (Demopoulos Dep. at 81.)

Demopoulos, dated July 14, 1997 ("Demopoulos Dep."), at 80–81 (annexed as Ex. E to Levine Decl.).); Deposition of John Falzarano, dated September 22, 1997 ("Falzarano Dep."), at 36–37 (annexed as Ex. C to Affidavit of Nicholas Metakis, sworn to February 6, 1998 ("Metakis Aff.").) However, RAC workers were always dispatched by the RAC facility, and there was no crossover of work or accounts between Reliance and RAC. (Falzarano Dep. at 38–39; McCarthy Dep. at 94; Pls.' Rule 56.1 Statement ¶¶ 8, 11.) Moreover, Reliance and RAC at all times maintained separate seniority lists. (Pls.' Rule 56.1 Statement ¶¶ 8, 11.)

Plaintiffs are oil drivers who at all relevant times were members of Local 553 and employees of Reliance. (Compl. ¶¶ 17–18.) RAC's drivers were also represented by Local 553. (Union Defs.' Rule 56.1 Statement ¶ 4.) The drivers in Petro's other three companies in Nassau and Suffolk Counties, as well as RAC's servicemen, were represented by Amalgamated Local 355 ("Local 355"). (*Id.;* McCarthy Dep. at 14.)

In 1996, Petro decided to realign its five companies in Nassau and Suffolk Counties. As explained by McCarthy, Petro's Senior Vice–President of Operations, Petro's marketing consultant

> looked to ... Long Island and New York City, the entire company, all of those places including Long Island and said that from a marketing point of view we operated under Reliance Rite, we operated under Giffords, we operated under Reliance Associates and subsequently to the beginning of their study, under Seaman Fuel, these various company names were a hindrance to our overall marketing of the ... image that we had in the marketplace and they competed against each other and [the consultant] felt we would be better served in the marketplace by being put under one logo, one banner and realigning our organization in a more competitive mode so that we could compete within the marketplace.

(McCarthy Dep. at 54–55.) Petro's plan called for eliminating two of its five Long Island companies, including RAC. (Pls.' Rule 56.1 Statement ¶ 14.) In early April 1996, company officials met with Demopoulos, Bernard Pelligrino, Local 553's Secretary–Treasurer, and Local 553's counsel at Local 553's offices in New York City to discuss the realignment. (McCarthy Dep. at 42.) Among the topics at the meeting were the potential conflicts between Local 553 and Local 355 posed by the realignment. (*Id.* at 44.) As regards the effect of the realignment on seniority, McCarthy opined that RAC's workers would be "slotted" into the Reliance drivers' list in some fashion, as was done in the previous consolidation between Reliance and Rite Fuel in 1992. (*Id.* at 51.)

Subsequent to the meeting, Local 553 made a formal demand for more detailed information concerning the realignment, including, *inter alia,* how many Local 553 members would be terminated or displaced and which areas of work Local 553 members would continue to perform. (*See* Levine Decl. Ex. J.) Further negotiations between Local 553 and Petro centered upon Local 553's efforts to retain as much work as possible for the former Reliance facility in light of Petro's decision to divide the work among the three remaining companies based upon geography. (McCarthy Dep. at 72–73; Demopoulos Dep. at 61.) These efforts were complicated by Local 355's claim that, as it represented a majority of Petro's drivers on Long Island, it was entitled to all of the work at the former Reliance facility. (McCarthy Dep. at 75–78, 101.) In McCarthy's words, both Local 553 and Local 355 "were trying to end up with a reasonable settlement that allowed both unions to stay as reasonably whole as they possibly could with both contending for as much work as they could." (*Id.* at 101–02.) In the end, Local 553 negotiated for an additional 3,400 accounts outside of the initial geographical

line of demarcation set by Petro. The total number of accounts handled by the former RAC and Reliance workers, however, fell from approximately 45,000 to 34,000. (Deposition of Joseph J. Berti, dated July 8, 1997 ("Berti Dep."), at 8 (annexed as Ex. F. to Levine Decl.).)

In the meantime, on April 16, 1996, McCarthy and other Petro officials met with the Reliance drivers and servicemen to discuss the realignment. (McCarthy Dep. at 61–62; Pls.' Rule 56.1 Statement ¶ 17.) Although Demopoulos attended this meeting, no Local 553 union official spoke to the union membership or otherwise had any involvement with the meeting. (McCarthy Dep. at 63, 66.) McCarthy advised the Reliance employees that some sort of "slotting"[2] would be employed to determine the seniority of the newly-combined workforce at the Reliance facility. (McCarthy Dep. at 65; Deposition of Nunzio Martino, dated July 7, 1997 ("Martino Dep."), at 27 (annexed as Ex. K to Levine Decl.); Deposition of Richard DeChiaro, dated July 7, 1997 ("DeChiaro Dep."), at 29 (annexed as Ex. L to Levine Decl.).) "Shooting from the hip," McCarthy speculated that "it looked close to a three-to-two ratio between Reliance and RAC." (McCarthy Dep. at 65.) At a second meeting held between company officials and Reliance employees on May 24, 1996, McCarthy again advised the employees that some sort of slotting would take place, but that "it hasn't been arrived at with the union how that would be done." (McCarthy Dep. at 69.)

From April 1996 through July 1996, Local 553 did not hold any special meetings with either the Reliance or RAC union members concerning the realignment. (Demopoulos Dep. at 33–34.) Local 553's communication with the Reliance drivers consisted of informal conversations between certain individuals and Demopoulos. (Demopoulos Dep. at 31–32; Metakis Aff. ¶ 29; Deposition of Steve Coticchio, dated June 20, 1997 ("Coticchio Dep."), at 31–32 (annexed as Ex. N to Levine Decl.); Pls.' Rule 56.1 Statement ¶ 22.)

After agreeing that the provision of the collective bargaining agreement (the "CBA") relating to mergers and consolidations would apply in determining the new seniority list for the combined Reliance/RAC workforce,[3] Demopoulos, based upon information submitted to him from Petro, actually prepared the new seniority list. (McCarthy Dep. at 102–03; Demopoulos Dep. at 24, 27–28.) Demopoulos testified that, in accordance with the CBA, he counted the number of employees on the seniority lists of Reliance and Petro on October 15, 1996, which revealed that the ratio of Reliance drivers to RAC drivers was six to five. (Dempoulos Dep. at 98.) Dempoulos applied this ratio by alternating between Reliance and RAC drivers four times, inserting two Reliance drivers together, then repeating the sequence. (*Id.* at 99–104.)

The combined seniority list, (*see* Levine Decl.Ex. J), was completed in June or early July 1996, and was posted at the Reliance facility on July 29, 1996. (Demopoulos Dep. at 28–30, 34.) Demopoulos did not advise any of the Reliance drivers in advance of the exact composition of the combined seniority list. (*Id.* at 32.) After the posting of the combined list, no special meetings were called by Local 553 to explain the list to the Reliance and RAC drivers. (*Id.* at 35.) Shortly after posting the list, Demopoulos received a telephone call from Plaintiff Metakis, who was unhappy with the list and did not understand how the list had been composed. (*Id.* at

---

**2.** It is undisputed that "slotting" is synonymous with "dovetailing," or combining two separate seniority lists based upon the respective positions of the employees on the two lists. In contrast, with "endtailing," the seniority list of one company is tacked onto the end of the seniority list of the other.

**3.** Demopoulos testified that he looked solely to the CBA provision on mergers and consolidations in composing the combined seniority list. (Demopoulos Dep. at 41.)

39.) Plaintiff DeChiaro expressed similar concerns to Demopoulos. (*Id.* at 76.) Demopoulos responded to both of them that the combined seniority list had been composed in accordance with the provisions of the CBA. (*Id.* at 39, 76.) Demopoulos also spoke with Plaintiffs Coticchio and Harjes. (*Id.* at 76–77.)

After Local 553 denied the request of Plaintiffs Metakis and Fay to submit a grievance with Petro over the issue of the composition of the new seniority list, (*see* Metakis Aff. ¶ 90), Plaintiffs commenced this hybrid action on February 11, 1997, pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185.

## DISCUSSION

### I. Summary Judgment Standards

The legal principles employed by the Court when ruling upon a motion for summary judgment are well-established. Summary judgment may be granted only when it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). The moving party bears the initial burden "of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The substantive law governing the case will determine those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has come forward with support demonstrating that no genuine issue of material fact remains to be tried, the non-moving party "must come

forward with affidavits, depositions, or other sworn evidence as permitted by Fed. R.Civ.P. 56, setting forth specific facts showing that there exists a genuine issue of material fact." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). In reviewing these materials, the Court "is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment." *Id.*

Nevertheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphases omitted). Moreover, "[c]onclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,'" *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505), and "more than 'some metaphysical doubt as to the material facts.'" *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Put another way, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, ... or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citations and internal quotations omitted).

### II. The Section 301/Fair Representation Hybrid Cause of Action

#### A. Introduction

A Section 301 hybrid cause of action brought by an employee involves two constituent claims. The suit against the employer is grounded upon Section 301 because the employee is claiming that the

employer violated the provisions of a collective bargaining agreement. Where, as here, however, the grievance procedures set forth in a collective bargaining agreement provide the exclusive means for resolving labor disputes, judicial review of an employer's actions is not available unless the employee shows a breakdown in the grievance process itself. Accordingly, the second claim in a hybrid cause of action is against the union for breach of its duty of fair representation. *See DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Because these two constituent claims are "inextricably interdependent," it is not enough that the employee demonstrates a breach of the collective bargaining agreement by the employer. To be successful against *either* the employer or the union, the employee must first shoulder its burden of establishing the union's breach of its duty. *Id.* at 164–65, 103 S.Ct. 2281; *see Young v. United States Postal Serv.,* 907 F.2d 305, 307 (2d Cir.1990).

## B. Timeliness of Plaintiffs' Action

The Union Defendants argue that Plaintiffs claims are time-barred, contending that Plaintiffs were on notice on April 16, 1996, at the latest, that the seniority lists of the Reliance and RAC drivers were to be dovetailed, rather than endtailed. Plaintiffs rebut that their claims did not accrue until August 14, 1996, which they allege to be the earliest date on which one of them "was informed [of] or saw the seniority list," (Pls.Mem. of Law at 8), or, alternatively, in February 1997, when Local 553 refused to file a grievance on behalf of the Reliance drivers.

The statute of limitations for hybrid Section 301/fair representation actions is six months. *DelCostello,* 462 U.S. at 172, 103 S.Ct. 2281. The limitations period " 'begins to run when a plaintiff knows or reasonably should know that the union has breached its duty of fair representation.' " *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir.1995) (quoting *Flanigan*

*v. Truck Drivers Local 671,* 942 F.2d 824, 827 (2d Cir.1991)).

To the extent Plaintiffs' claim against Local 553 is predicated upon its alleged erroneous decision to dovetail, as opposed to endtail, the Reliance and RAC seniority lists, the Court notes that at the April 16, 1996 meeting between Petro officials and the Reliance drivers, McCarthy, in response to a question "how the slotting looked," opined that it "looked close to a three-to-two ratio between Reliance and RAC." (McCarthy Dep. at 65.) In point of fact, several Plaintiffs testified at deposition that it was their understanding that the Reliance and RAC lists were to be dovetailed in some respect. Martino conceded that "there was no question in [his] mind as of April of 1996" that the two lists would be slotted. (Martino Dep. at 27.) DeChiaro conceded that, as of April 1996, he was "under no illusion that there would be something other than a slotting of the seniority list." (DeChiaro Dep. at 29.)

Plaintiff Metakis, however, testified that Bernard Pelligrino, Local 553's Secretary–Treasurer, told him "point blank" at a union meeting that "before he would let [Local 553's customers be diverted from the Hicksville facility], he would close Petro down in New York City." (Metakis Dep. at 23, 40.) In light of Pelligrino's stand, Metakis assumed that all of RAC's accounts would follow RAC's workers to the former Reliance facility. (*Id.* at 43.) Metakis further testified that he did not discover that all of RAC's accounts were not transferred to the former Reliance facility until a short time after the combined seniority list was posted on July 29, 1996. (*Id.* at 49.) It is Metakis's position that because all of RAC's accounts did not follow the workers to the former Reliance facility, the merger and consolidation provision of the CBA—along with its requirement that seniority lists be dovetailed—was inapplicable to the realignment of Petro's companies. (*Id.*) After the list was posted, Metakis spoke with his shop steward, who advised him that there was noth-

ing he could do about the list. (*Id.* at 70.) Then, on August 22 or 23, 1996, both Demopoulos and Pelligrino advised Metakis during a telephone conversation that there was nothing Metakis could do at that point with regard to the seniority list. (*Id.* at 69.)

Based on the foregoing, a rational trier of fact could conclude that the statute of limitations on Plaintiffs' claim against Local 553 for breach of the duty of fair representation—predicated upon Local 553's decision to dovetail the Reliance and RAC seniority lists—accrued on August 22 or 23, 1996, which is within the six-month limitations period. *See also Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 165 (2d Cir.1989) ("Where a union ... decides to stop assisting a member, ... a breach of duty by the union is apparent to the member at the time [ ]he learns of the union ... inaction about which [ ]he complains.").

## C. The Substantive Merits of Plaintiffs' Claims

### 1. Local 553

■ A union's duty to represent fairly its members is not codified; instead, it "is implied under the scheme of the National Labor Relations Act." *DelCostello*, 462 U.S. at 164, 103 S.Ct. 2281. Generally, " 'as the exclusive bargaining representative of the employees, ... the Union ha[s] a statutory duty fairly to represent all of those employees, both in its collective bargaining ... and in its enforcement of the resulting collective bargaining agreement.' " *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). To establish Local 553's breach of its duty of fair representation, Plaintiffs must demonstrate that, in combining the Reliance and RAC seniority lists, Local 553's conduct was " 'arbitrary, discriminatory, or in bad faith.' " *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 16 (2d Cir.1993) (quoting *Vaca*, 386 U.S. at

190, 87 S.Ct. 903). "Judicial review of union action, however, must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." *Spellacy v. Airline Pilots Ass'n–Int'l*, 156 F.3d 120, 126 (2d Cir.1998) (citations and internal quotation marks omitted), *petition for cert. filed*, 67 U.S.L.W. 3469 (U.S. Jan. 11, 1999) (No. 98–1113).

Plaintiffs' primary contention is that Local 553 breached its duty of fair representation by dovetailing the seniority lists of the Reliance and RAC drivers. Alternatively, Plaintiffs maintain that assuming, *arguendo*, it was appropriate to dovetail the two seniority lists, Local 553 erroneously compiled the new seniority list in light of past practice. Additionally, Plaintiffs fault Local 553 for failing to file a grievance with Petro over the composition of the seniority list. Finally, Plaintiffs claim that Local 553 continually failed to respond to their requests for information regarding the composition of the seniority list. The Court will address each of these arguments in turn.

### a. Local 553's Decision to Dovetail

#### (1) Arbitrariness

■ It is well-settled that "a unions's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (citation and internal quotation marks omitted). Mere negligence on the part of the union does not constitute a breach of the duty of fair representation. *Cruz v. Local Union Number 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154 (2d Cir.1994).

Section 60 of the CBA provides in pertinent part as follows:

(a) In the case of merger or any type of consolidation (except acquisition

which is governed by (b) below) of the Employer with any other company or business of any other company, whether involving partnership, corporation, or any other form, the following shall prevail:

1. If both companies prior to the merger or consolidation were covered by this collective bargaining agreement or counterpart thereof the employees in the successor enterprise shall be selected and shall have seniority as follows: The number of employees from each company to be placed on the combined seniority list shall be in the same proportion as the number of employees on the seniority list of each company on the preceding October 15.

(Compl.Ex.A.) Both Petro and Local 553 agreed that the realignment of Petro's five Long Island companies into three constituted a "consolidation," and that consequently Section 60(a)(1) of the CBA—which called for dovetailing the seniority lists of the combining companies—was applicable. (McCarthy Dep. at 74, 81–82; Demopoulos Dep. at 39–41.) Demopoulos, who actually combined the seniority lists of Reliance of RAC on behalf of Local 553 based upon information given to him by Petro, testified that Petro's realignment of its Long Island facilities was a merger or consolidation "because it was one company owning two companies that [Local 553] had contracts with that were going to [be] put ... together." (Demopoulos Dep. at 48.) Plaintiffs, however, contend that Local 553 arbitrarily applied Section 60(a)(1) in combining the seniority lists of Reliance and RAC, and overlooked other provisions of the CBA that called for endtailing the RAC drivers.

■■ To uphold Local 553's application of Section 60(a)(1) of the CBA, "it is not necessary that [the Court] find on the merits that such an interpretation was correct. Rather, [the Court's] inquiry is limited to whether the union took a position on the basis of an informed, reasoned

judgment ... in light of the language contained in the collective bargaining agreement." *Spellacy*, 156 F.3d at 127 (citation and internal quotation marks omitted) (holding union's interpretation of collective bargaining agreement, "while arguably wrong, is not so unreasonable as to constitute a breach of the duty of fair representation"). Moreover, in determining whether Local 553's interpretation of the CBA was based upon an informed and reasoned judgment, the Court is cognizant that

> [a] collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. It is a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate. The collective bargaining agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or a particular plant.

*Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 311–12, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (citations and internal quotation marks omitted). Consistent with the foregoing, "the parties' 'practice, usage and custom' is of significance in interpreting their agreement," *Consolidated Rail*, 491 U.S. at 311, 109 S.Ct. 2477 (quoting *Transportation–Communication v. Union Pac. R.R.*, 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966)), and parol evidence may be used freely. *See Southeastern Pennsylvania Transp. Auth. v. Brotherhood of R.R. Signalmen*, 882 F.2d 778, 784 (3d Cir.1989) (collecting cases from other circuits).

■ Based upon a review of the record, the Court holds that Local 553's application of Section 60(a)(1) was "not so unreasonable" as to permit a rational trier of fact to conclude that Local 553 breached its duty of fair representation. In support of their claims, Plaintiffs first maintain that Local 553 erroneously refused to con-

sider Sections 60(b)(1) and 73 of the CBA. Section 60(b) provides in relevant part that

[i]n the case of the acquisition by the Employer of another company, or acquisition of the Employer's business by another company, or in the case of any other type of acquisition of business, whether involving partnerships, corporations or any other form the following shall prevail:

1. If both companies prior to the acquisition were covered by this collective bargaining agreement or counterpart thereof, the employees of the acquired company shall be placed on the seniority list of the acquiring company below the employees of the acquiring company.

(Compl.Ex.A.) Plaintiffs claim that the 1996 realignment was in reality "an acquisition of entities [namely, Reliance and RAC] by [Petro] over a period of time which culminated in 1996." (Metakis Aff. ¶ 46.) It is undisputed, however, that RAC, which was acquired by Petro in 1992, was operated independently from Reliance (which had been acquired by Petro in 1981 and merged with Rite Fuel in 1992) for four years until its consolidation with Reliance in July 1996. *See In re ABF Freight Sys., Inc. Labor Contract Litig.*, 988 F.Supp. 556, 564 (D.Md.1997) (holding union properly treated combination of two companies as merger where, after acquisition of two companies was completed, they operated independently for six weeks). As was the case in *In re*

*ABF Freight,* the injuries sustained by Plaintiffs in this action were not caused by Petro's acquisition of RAC in 1992, but rather by the consolidation of Reliance with RAC in 1996.[4]

Plaintiffs additionally contend that Local 553 erroneously failed to consider Section 73 of the CBA. That provision provides that

[i]t is agreed by both parties that depot seniority shall prevail. If a firm closes one depot and opens a new depot, the fuel oil chauffeurs from the closed depot have first preference in the new depot. In the event that a new depot is opened the fuel oil chauffeurs on the seniority lists in the other depots belonging to the firm will receive first preference.

(Compl.Ex.A.) By its terms, Section 73 is triggered only if a "new" depot is opened. The record establishes that, other than a change in name, new uniforms and newly-painted trucks, the former Reliance facility continued its same work unabated; no new buildings were constructed or leased by Petro, drivers continued to report to the former Reliance facility and the management remained the same. Demopoulos testified that he understood Section 73 to mean "a company closing one operation and moving to another one .... for instance, closing a Long Island location and opening up a Queens location," (Demopoulos Dep. at 49), a position that was shared by Petro, (see McCarthy Dep. at 96),[5] and no rational trier of fact could conclude that

---

4. In further support of their claim, Plaintiffs cite Section 60(b)(3) of the CBA, which states that "[a]n Employer shall not be permitted to frustrate the purposes of this provision by maintaining a separate seniority list for the employees of an acquired business and thereafter attempting to establish a combined seniority list under paragraph A hereof or by any other means." As a threshold matter, neither Local 553 nor any of its individual members questioned the propriety of Petro's maintenance of a separate seniority list for the RAC drivers upon the acquisition of RAC in 1992. In any event, Plaintiffs have failed to adduce any facts supporting their assertion that Petro maintained separate seniority lists

at Reliance and RAC for the purpose of "manipulating [its] workforce to its advantage," (Metakis Aff. ¶ 52); the fact that RAC operated independently for four years severely undermines Plaintiffs' boilerplate argument in this regard.

5. In point of fact, McCarthy observed that, had the former Reliance facility been treated as a "new depot" within the meaning of Section 73, Local 335 could more forcefully assert that it was entitled to displace Local 553 entirely at the former Reliance facility. (McCarthy Dep. at 97, 101.)

this interpretation was unreasonable,[6] particularly where, as here, Plaintiffs have failed to allege that Local 553's interpretation of Section 73 was inconsistent with past practice.

Finally, Plaintiffs maintain that the 1996 realignment of Petro's companies was not a merger or consolidation because "[i]n prior company transformations under [Section] 60(a)(1), *all* the accounts, trucks and equipment shifted over at the time of transfer." (Metakis Aff. ¶ 38.) The only "prior transformation" present in the record was the consolidation of Reliance and Rite Fuel in 1992. To be sure, that "transformation," in which the seniority lists of Reliance and Rite Fuel were dovetailed in accordance with Section 60(a)(1), is not perfectly analogous to Petro's 1996 realignment. In the case of Reliance/Rite Fuel, all of Rite Fuel's accounts were transferred along with its workers. There, however, Petro was merging two companies into one; geography played no part in the realignment. Here, Petro was consolidating five companies into three based upon geography. The fact that not all of RAC's accounts followed its workers to Reliance does not *ipso facto* render Local 553's characterization of the 1996 realignment inappropriate. In this regard, the Court notes that neither "merger" nor "consolidation" are defined in the CBA. Moreover, the CBA calls for dovetailing seniority lists where there is "*any* type of consolidation." In light of the language of Section 60(a)(1), along with the lack of past precedent for treatment of seniority under the circumstances presented by Petro's 1996 realignment, Local 553's decision to treat Petro's realignment of its five Long Island companies into three based upon geography as a merger or consolidation was not, as a matter of law, arbitrary or capricious.[7]

### (2) Bad Faith

Plaintiffs contend that Local 553 dovetailed the seniority lists to benefit George Walters, RAC's shop steward and a Local 553 trustee. At deposition, however, none of the Plaintiffs presented anything other than speculation and surmise to support their assertion that the combined seniority list was the product of favoritism toward Walters. Plaintiff Metakis avers that had the seniority list been properly compiled, Walters would have been laid off, resulting in his loss of a trusteeship position with Local 553 on account of not being "actively employed." (Metakis Dep. at 59; Metakis Aff. ¶¶ 66–71.) As noted by the Union Defendants, however, Local 553's By–Laws provide that "[p]eriods of unemployment during the twenty-four month period preceding the nomination [for a position of officer with Local 553] shall not be considered a break in active employment at the craft within the jurisdiction of the Local Union if the nominee was actively seeking and available for employment in the craft, and not working outside the craft during such period of unemployment." (Levine Reply Decl.Ex. A.)

Moreover, while the Court sympathizes with the fact that Plaintiffs were harmed because not all of the accounts of the RAC drivers followed them to the former Reliance facility, Local 553's actions must be considered in light of Petro's decision to geographically consolidate its five companies into three, the propriety of which has not been questioned by either Local 553 or Plaintiffs. The consolidation presented a conflict between Local 553 and Local 335 over which accounts would remain at the former Reliance facility. While Local 553 was not successful in securing all of RAC's accounts for the former Reliance facility, it

---

**6.** At least one Plaintiff conceded that he could "understand" Local 553's interpretation of Section 73. (Coticchio Dep. at 21.)

**7.** Local 553's failure to compose the combined seniority list of Reliance and RAC drivers on the basis of date of hire, which Plaintiffs concede would have been outside of the scope of the CBA, similarly did not constitute a breach of the duty of fair representation.

is undisputed that Local 553—for the ultimate benefit of all the new drivers at the former Reliance facility—negotiated an expansion of the original geographical line of demarcation set by Petro.

Accordingly, Plaintiffs' claim that Local 553 acted in bad faith in dovetailing the seniority lists of Reliance and RAC is unavailing.

### (3) Discrimination

■ Finally, there is no merit to Plaintiffs' claim that Local 553 discriminated against the Reliance drivers in favor of the RAC drivers by dovetailing the seniority lists of each. As a threshold matter,

> [t]he duty of fair representation does not require that a union achieve absolute equality among its members. Rather, because a union by necessity must differentiate among its members in a variety of contexts, a showing that union action has disadvantaged a group of members, without more, does not establish a breach of the duty of fair representation.

*Haerum v. Air Line Pilots Ass'n*, 892 F.2d 216, 221 (2d Cir.1989) (citation omitted). In a case rejecting an attack on a union's integration of seniority lists, the Supreme Court stated as follows:

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion. Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue

is chiefly between two sets of employees. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes.

*Humphrey v. Moore*, 375 U.S. 335, 349–50, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *see Clayton v. Republic Airlines, Inc.*, 716 F.2d 729, 732 (9th Cir.1983) ("[C]ourts have observed that within th[e] context [of integration of seniority lists], it is almost inevitable that some individuals will be injured, and that even where the same union represents both bodies of employees, it does not breach its duty to individual members as long as it proceeds on some reasoned basis."); *Kesinger v. Universal Airlines, Inc.*, 474 F.2d 1127, 1130 (6th Cir.1973) ("[T]he mere fact that the integration of a seniority list is detrimental to one group of employees, and favorable to another, does not establish that the union has breached its duty of fair representation if it has integrated the list in good faith and not on grounds totally irrelevant to seniority."); *see also Spellacy*, 156 F.3d at 129 ("A union's reasoned decision to support the interests of one group of employees over the competing interests of another group does not constitute arbitrary conduct."); *Capobianco v. Brink's, Inc.*, 543 F.Supp. 971, 975 (E.D.N.Y.1982) ("As long as the union acts in good faith, courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage."), *aff'd*, 722 F.2d 727 (2d Cir.1983) (unpublished table decision).

Assuming, as Plaintiffs argue, that the CBA did not specifically provide for the method of combining the seniority lists of Reliance and RAC, "[c]ase law has recognized that dovetailing is an appropriate and fair way to resolve the problem presented when seniority rights are affected by the combining of the operations of two or more companies which are signatories to a collective bargaining agreement." *In*

*re ABF Freight,* 988 F.Supp. at 566; *see Humphrey,* 375 U.S. at 347, 84 S.Ct. 363 (noting dovetailing is "a familiar and frequently equitable solution to the inevitably conflicting interests which arise in the wake of a merger or an absorption"); *Rakestraw v. United Airlines, Inc.,* 981 F.2d 1524, 1533 (7th Cir.1992) ("A rational person could conclude that dovetailing seniority lists in a merger, treating service at either firm as of equal weight, without quotas or other preferences for either group of employees, serves the interests of labor as a whole."); *Ekas v. Carling Nat'l Breweries, Inc.,* 602 F.2d 664, 668 (4th Cir.1979) (finding dovetailing provides an "eminently reasonable method of resolving competing seniority claims"). Here, of course, the rationality of Local 553's decision to dovetail the seniority lists was reinforced (and likely mandated) by Section 60(a)(1) of the CBA.

### b. Local 553's Drafting of the Seniority List

Alternatively, Plaintiffs claim that Local 553 erroneously compiled the July 29, 1996 seniority list by (1) failing to blend the employees as it had done in the past, (2) applying an improper ratio of Reliance drivers to RAC drivers and (3) eliminating certain Reliance drivers from the list while at the same time retaining certain RAC drivers.

As referenced previously, the Section 60(a)(1) provides that "[t]he number of employees from each company to be placed on the combined seniority list shall be in the same proportion as the number of employees on the seniority list of each company on the preceding October 15." (Compl.Ex.A.) In the case at bar, the proper reference date for determining the ratio of Reliance drivers to RAC drivers was October 15, 1995. The parties agree that post-October 15, 1995 retirements, deaths, terminations, buy-outs, etc. were not relevant in determining the ratio. (McCarthy Dep. at 85; Metakis Aff. ¶ 57.)

Utilizing driver sign-in sheets from both Reliance and RAC, Local 553 calculated 28 Reliance drivers and 23 RAC drivers as of October 15, 1995. Plaintiffs, however, contend that 30 Reliance employees should have been utilized in determining the ratios, or, alternatively, 21 RAC employees should have been utilized. More specifically, Plaintiffs allege that two Reliance employees who retired were improperly excluded, while two RAC employees who took buyouts from Petro were improperly included. In so arguing, however, Plaintiffs wholly ignore the time frame in which the retirements and buyouts occurred. A notation on the Reliance sign-in sheet utilized in computing the ratio indicates—and nowhere in their voluminous opposition papers do Plaintiffs dispute—that "30 signed in but 2 retired on or by 10/15/95." (Levine Decl.Ex. I.) To the contrary, the two RAC drivers accepted Petro's buy-out offer—which had been extended to both Reliance and RAC drivers—in or about April 1996. (Employer Defs.' Rule 56.1 Statement ¶¶ 15–17.) Accordingly, Local 553 did not improperly calculate 28 Reliance employees and 23 RAC employees in determining the proper ratio for purposes of the combined seniority list.

Plaintiffs' claims that Local 553 applied an improper ratio and improperly blended the Reliance and RAC drivers merit less attention. The ratio of 28 to 23 computes to 1.22 to 1, which equates to 6.1 to 5. Neither Local 553's decision to round this ratio to 6 to 5, nor its decision to employ the slotting system it did, *i.e.,* alternating Reliance and RAC employees four times, inserting two Reliance employees, then repeating the sequence, was irrational.

### c. Local 553's Failure to File a Grievance

Plaintiffs assert that Local 553 breached its duty of fair representation by failing to file a grievance with Petro over the composition of the combined seniority list of Reliance and RAC drivers. Because Local 553

reasonably concluded that the composition of the combined seniority list was proper, Local 553 did not breach its duty of fair representation by failing to process a grievance on behalf of the Reliance drivers. *See Spellacy,* 156 F.3d at 128 ("Because [the union's] decision not to prosecute [employee] grievances was based on a reasonable interpretation of the [collective bargaining agreement], [the union] did not breach its duty of fair representation.").

#### d. Local 553's Lack of Communication With its Members

 Plaintiffs claim that Local 553 provided "[l]ittle information ... regarding the process [of combining the Reliance and RAC seniority lists] and [Local 553's] thinking," and that "requests for information after the [combined] list was posted were ignored." (Metakis Aff. ¶¶ 80, 84.) Indeed, the record establishes that no "special meetings" to discuss the compilation of the combined seniority list of Reliance and RAC drivers were held, and that information was conveyed by Local 553 to the Reliance drivers through individual informal conversations between Demopoulos and individual union members. The fact that Local 553 may have failed to keep the Reliance drivers fully informed of the status of the combined seniority list, however, is not evidence that Local 553 acted arbitrarily, discriminatorily or in bad faith in compiling the seniority list.[8] *Cf. Tracy v. Local 255 of the Int'l Union of Electronic, Electrical, Technical, Salaried and Machine Workers,* 783 F.Supp. 1527, 1531 (D.Mass.1992) ("[F]ailure of the union to provide information on the status of a grievance is not indicative of arbitrary behavior in the processing of the grievance itself. ... Lack of communication, without more, is insufficient to evidence arbitrary or capricious processing of a claim.").

Plaintiffs also fail to demonstrate how better communication from Local 553 would have brought about a different re-sult. *See Spellacy,* 156 F.3d at 130 (noting plaintiffs must establish causation in breach of duty of fair representation action). Demopoulos testified that his compilation of the combined seniority list was based solely upon Local 553's interpretation of the CBA, an interpretation this Court has found to be rational.

#### 2. Petro

Because the Court concludes that no genuine issues of material fact exist with respect to Plaintiffs' claim against Local 553 for breach of the duty of fair representation, the Court need not address whether Petro violated the terms of the CBA.

### CONCLUSION

The Court has considered Plaintiffs' remaining contentions and finds them to be without merit. For the reasons set forth above, the motions of the Union Defendants and the Employer Defendants for summary judgment on Plaintiffs' claims is **GRANTED.** The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

---

8. There is no evidence in the record that Local 553 acted any differently toward the RAC drivers as regards providing information on the compilation of the seniority list.